### COMMONWEALTH vs. RUSSELL J. HORTON.

Plymouth. April 6, 2001. - August 14, 2001.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Evidence,* Prior misconduct, State of mind. *Joint Enterprise. Practice, Criminal,* Required finding, Assistance of counsel, Capital case. *Homicide. Constitutional Law,* Assistance of counsel.

At a murder trial, the judge did not abuse his discretion in admitting evidence of the defendant's involvement with drugs and evidence of the defendant's desire to rob a bank, where these prior acts were highly relevant to the motive behind the killings and the relationship between the defendant and the victims. [827-828]

At a murder trial, there was no error in admitting certain statements of a codefendant for the purpose of showing his state of mind. [828]

At a murder trial, there was sufficient evidence presented to prove that, even if the Commonwealth were unable to prove beyond a reasonable doubt that the defendant was the actual shooter, the defendant had participated in a joint venture with another to commit the crimes; that robbery was the purpose behind the shootings; and that there was deliberate premeditation. [828-830]

At a murder trial, there was nothing manifestly unreasonable about defense counsel's tactical decisions, and the defendant failed to show that the jury's decision was likely affected by any of the defendant's claimed errors, including counsel's failure to protect the defendant's right to a public trial [830-833], to offer alibi witnesses [833], to offer consciousness of innocence and good character evidence [833-834], to introduce expert evidence [834], to suppress a witness's identification of the defendant [834-835], to undermine an alleged robbery motive [835-836], and to object to the judge's instructions [836-837].

At a hearing on a motion for a new trial, there was no error in the judge's conclusion that an affidavit presented to cast doubt on a witness's identification of the defendant was consistent with and merely cumulative of the testimony at trial. [837]

INDICTMENTS found and returned in the Superior Court Department on August 30, 1994.

The cases were tried before *Charles J. Hely,* J., and a motion for a new trial was heard by him.

*Emanuel Howard* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

Sosman, J. The defendant was convicted on two indictments charging murder in the first degree (on grounds of deliberate premeditation and felony-murder) and one indictment charging assault with intent to murder.[1] On appeal, the defendant claims error in (1) the admission of prior bad act evidence; (2) the admission of statements of a coventurer; (3) the judge's denial of his motion for a required finding of not guilty; (4) the ineffective assistance of his counsel; and (5) the judge's denial of a motion for a new trial based on newly discovered evidence. The defendant also requests that we use our plenary power under G. L. c. 278, § 33E, to reduce the degree of guilt. For the reasons set forth below, we affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* Viewed in the light most favorable to the Commonwealth, the evidence was as follows. On the evening of May 25, 1994, the three victims (Carlos Araujo [Carlos], his brother Manuel Araujo [Manuel], and Kepler Desir) drove together from Boston to Brockton. During that drive, Desir spent most of his time on the car telephone and checked his pager several times. After getting off the telephone, Desir instructed Manuel to drive to Owens Avenue to pick up "some guys." When they arrived at the house at 16 Owens Avenue, they met up with the defendant and Frederick Christian.[2] Carlos did not know either of them, but Desir introduced the defendant as "Russell" and introduced Christian as "Fred." The defendant and Christian got into the back seat, and the five men drove off. The defendant was sitting behind the driver (Manuel), Christian was in the middle, and Carlos was sitting behind Desir. The

---

[1] His codefendant was tried separately and convicted on two indictments charging murder in the first degree on a theory of felony-murder. We affirmed those convictions. *Commonwealth* v. *Christian*, 430 Mass. 552 (2000).

[2] Earlier that day, Desir had given his pager number to Christian. A pager was later retrieved from Desir's body. Stored in its memory was a page from a telephone number at the 16 Owens Avenue address. Shortly before the arrival of Desir, Manuel, and Carlos at 16 Owens Avenue, a witness overheard the defendant speaking to someone on the telephone and asking the person on the other end of the line to "come pick him up." The jury could thus infer that Desir had been contacted by pager, and that it was the defendant who had spoken to Desir to arrange for the meeting.

defendant said that he wanted to rob some Dominican drug dealers, and he directed Manuel to a particular location to carry out that plan. En route, the defendant pulled a gun out from his backpack and asked the others if they were carrying guns. They replied that they did not have any guns. The defendant then placed the gun in his waistband. At the ·defendant's instruction, Manuel parked the car on a dead-end street, and the defendant and Christian left the car, purportedly on their way to rob people in a nearby drug house. They came back five minutes later, reporting that they had been unable to complete the robbery because of the presence of an unexpected person. They returned to their seats in the car. Expressing concern that they were in a "crime watch" area, the defendant then told Manuel to take them to a nearby school parking lot. Manuel did so, and stopped the car in the designated lot.

In the parking lot, while gazing out the rear side window, Carlos suddenly felt a gunshot to his head. He slumped forward and remained motionless, pretending to be dead. Carlos heard Manuel say, "Oh, shit." Two more shots followed. Carlos then heard the defendant say, "Go through his pockets. Turn off the lights." Carlos felt Christian move from his seat, and then heard Christian ask, "Did you do him?" There was no response. Several minutes later, the defendant and Christian left the car.

Carlos waited a few moments, looked up, and saw the bodies of his brother and Desir. He got out of the car and ran to the nearest house for help. Carlos told the people in the house that "Russell" shot him, but that he did not know why. Later, after being taken to a hospital, Carlos also told the police that "Russell" had shot him. He was shown photographic arrays, from which he identified Christian, but he did not make an identification of the defendant from an array containing the defendant's photograph.[3]

Barry Stephens lived near the parking lot where the murders occurred. He knew both the defendant and Christian. Stephens testified that the defendant sold crack cocaine out of Stephens's home in Brockton, and that the defendant had previously sold

---

[3]He later did identify the defendant, but only after having seen his photograph in a newspaper.

drugs for Desir. However, there had been a recent falling out, and the defendant was no longer working for Desir. On the night of May 25, 1994, Stephens heard several gunshots. Five minutes later, the defendant and Christian knocked on his door. The defendant "was foaming at the mouth" and looking "kind of wild." The defendant told Stephens, "I smoked him . . . I smoked all three of them." The defendant indicated that the person he had just "smoked" was "Quarter," a nickname by which Desir was known. The defendant threw a gun on the bed and asked Stephens if he would hold it. Stephens refused, and told the defendant to leave. The defendant expressed concern about leaving because there were "too many police out there." Stephens insisted that he leave. The defendant retrieved the gun and put it into his backpack. Prior to leaving with the defendant, Christian told Stephens, "Keep it under your hat."

There was evidence that the defendant and Christian were in need of money at the time of the murders. Stephens testified that, two weeks earlier, the defendant told him that he and Christian were planning to rob a bank. On the day of the murders, Christian told another witness that he needed money, and he asked Desir to give him drugs on credit. Desir refused to do so. There was also evidence that Christian knew that Desir was likely to be carrying a substantial amount of money that evening. Henry Garcia testified that he and Desir were planning on traveling to New York to buy $5,500 worth of drugs later that night, and that Christian was aware of that plan. Garcia was only providing $1,500 of the purchase price, and Desir was to provide the rest. Desir's girl friend testified that Desir had a substantial amount of cash at the time he was murdered, but she was unable to find any of it afterward.[4]

Pursuant to a warrant, the police seized a pair of sneakers, jeans, and a note from the defendant's bedroom. DNA analysis conducted by Cellmark Diagnostics revealed that blood found on the sneakers and jeans contained a DNA profile consistent

---

[4]When police arrived at the murder scene, they noticed that Desir's shirt was untucked and lifted up on the left side. They found only $1.15 in cash on his person.

with Manuel's DNA.[5] The defendant and the other two victims were excluded as possible contributors to the bloodstains on the defendant's clothing.

The defendant gave a statement to the police. He initially told police he went to Owens Avenue to meet Christian. He made a few telephone calls, but said he did not page anyone. He and Christian went out for a walk and spent the evening with another friend. He eventually walked home, arriving there at 11 P.M. The police then told the defendant that they were checking the car for fingerprints, and that they were simultaneously interviewing Christian. The defendant then revised his statement, acknowledging that he did page Desir after he met up with Christian at Owens Avenue, and that Desir then came to pick them up. The defendant said that Manuel was driving, with Desir in the front passenger seat. The defendant sat behind Manuel, Christian sat in the middle, and another man (whose name he did not know) sat behind Desir. He said they all drove to Fuller Avenue, where he and Christian got out to go buy cocaine. He thought Manuel would return shortly to pick them up, but he claimed that they never returned and he did not see them again.

2. *Admission of prior bad act evidence.* The defendant claims the judge erred in admitting evidence of the defendant's involvement with drugs and evidence of the defendant's desire to rob a bank. He contends this was improper character evidence calculated to prejudice the jury against him.

Evidence of prior bad acts may not be admitted to show that the defendant has a criminal propensity or is of bad character. *Commonwealth* v. *Robertson,* 408 Mass. 747, 750 (1990). "Such evidence, if relevant, may be admitted, however, if it is offered for a purpose other than impugning the defendant's character, and if its probative value is not substantially outweighed by any prejudice." *Commonwealth* v. *Marrero,* 427 Mass. 65, 67 (1998), quoting *Commonwealth* v. *Otsuki,* 411 Mass. 218, 236 (1991). Thus, evidence of prior bad acts may, if not unduly prejudicial, be used to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation.

---

[5]The frequency of that DNA profile was one in 5,500 Caucasians, one in 14,000 African-Americans, and one in 14,000 Hispanics.

See P.J. Liacos, Massachusetts Evidence 154 (7th ed. 1999). "Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge. . . . [T]he judge's determination of these questions will be upheld on appeal absent palpable error." *Commonwealth* v. *Marrero, supra* at 67-68, quoting *Commonwealth* v. *Valentin,* 420 Mass. 263, 270 (1995).

The judge did not abuse his discretion in admitting the evidence of the defendant's drug dealing and his earlier plan to rob a bank, because these prior acts were highly relevant to the motive behind the killings and the relationship between the defendant and the victims. The defendant's knowledge of Desir as a potentially lucrative target for armed robbery was based exclusively on the participants' involvement and familiarity with drug dealing. There was no error in admitting this evidence.

3. *Statements of coventurer.* The defendant claims error in the judge's admission of statements by Christian to the effect that he (Christian) wanted Desir to extend him credit for drugs and that he needed money. The defendant claims that the Commonwealth did not establish that the statements were made "during the pendency of the cooperative effort and in furtherance of its goal." *Commonwealth* v. *Pleasant,* 366 Mass. 100, 104 (1974). However, this evidence was admitted under the state of mind exception, not as statements of a coventurer. The judge found Christian's statements pertained to his intent to rob, a critical element of the alleged felony underlying the Commonwealth's theory of felony-murder. "[A] declaration of intention, offered to prove the declarant's state of mind, then and later . . . is not excluded by the hearsay rule; either it is not hearsay, or it is within an exception to the hearsay rule." *Commonwealth* v. *Wampler,* 369 Mass. 121, 123 (1975), citing *Commonwealth* v. *DelValle,* 351 Mass. 489, 491-492 (1966). There was no error in admitting Christian's statements for the purpose of showing Christian's state of mind.

4. *Sufficiency of the evidence.* The defendant contends that the evidence was insufficient to prove that a joint venture existed

between the defendant and Christian,[6] and that his motion for required findings of not guilty should have been allowed. In reviewing a denial of a motion for a required finding of not guilty, we consider the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Fisher*, 433 Mass. 340, 342 (2001). The result need not be inescapable, but merely permitted by the evidence. See *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000), and cases cited.

There was sufficient evidence to submit the case to the jury on a theory that the defendant was culpable as a joint venturer. A joint venture is established where the defendant was (1) present at the scene of the crime; (2) with knowledge that another intends to commit the crime or with intent to commit the crime; and (3) by agreement is willing and available to help the other if necessary. *Commonwealth* v. *Berry*, 431 Mass. 326, 330 (2000). *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). Ample evidence supports the theory that the defendant and Christian acted together in committing these crimes. There was testimony that the defendant and Christian wanted money and planned to rob a bank together; that they were together when the page summoning Desir was made; and that they both got into the victims' car, told the victims of their ostensible plan to rob some drug dealers, and instructed Manuel where to go. The defendant showed the victims his gun, and asked if any of the others had a gun (thereby ascertaining that none of the intended victims was armed). Christian and the defendant left the car for several minutes and returned together, providing an account of how their purported robbery attempt had been frustrated. During the perpetration of the actual crimes, Carlos heard the defendant telling Christian, "Go through his pockets." He also heard Christian ask the defendant, "Did you do him?" Christian and the defendant then fled together to Stephens's house, where the defendant tried to dispose of the murder weapon. In short, there was overwhelming evidence that the

---

[6]Although the Commonwealth's primary theory was that the defendant himself shot the victims, it also proceeded on the alternative theory that he was a joint venturer with Christian.

defendant and Christian were acting together to carry out a prearranged plan to kill and rob Desir. Thus, even if the Commonwealth were unable to prove beyond a reasonable doubt that the defendant was the actual shooter,[7] the Commonwealth presented abundant evidence that he had participated in a joint venture with Christian to commit these crimes.

The defendant also contends there was insufficient evidence of armed robbery or attempted armed robbery, and thus no predicate felony for the felony-murder theory. Viewed in the light most favorable to the Commonwealth, there was evidence of Christian's need for money, of the defendant's plan to rob a bank with Christian, of Christian's knowledge that Desir would have a significant amount of money on him that night, of the defendant's instruction to Christian to "[g]o through his pockets," and of the disappearance of Desir's large amount of cash. This evidence sufficed to prove that robbery was the purpose behind these shootings.

The defendant's final contention that there was insufficient evidence to support a finding of deliberate premeditation is also unavailing. Having arranged a meeting with Desir, the defendant brought a loaded gun to that meeting, ascertained that the victims were not armed, and directed them to an inconspicuous location. He then shot each victim in the head. "The use of a firearm in the killing is sufficient to support a verdict of murder in the first degree based on deliberately premeditated malice aforethought. . . . Evidence that the defendant brought a gun with him to the scene . . . is evidence of planning" (citations omitted). *Commonwealth* v. *Martinez*, 431 Mass. 168, 173 (2000), quoting *Commonwealth* v. *Williams*, 422 Mass. 111, 123 (1996).

5. *Ineffective assistance of counsel.* The defendant contends that his trial counsel was ineffective in a myriad of ways. He

---

[7]Defense counsel's cross-examination of Carlos, and of the police officers who had interviewed Carlos, stressed that Carlos had not been in any position or condition to determine who had actually done the shooting, and counsel argued that Carlos's identification of the defendant as the shooter was the product of Carlos's "speculat[ion]." Throughout the trial, he had highlighted the evidence that it was Christian who had the motive to kill Desir and had superior knowledge of Desir's plans. In closing argument, defense counsel's theory was that Christian alone had shot the victims.

claims he was prejudiced by counsel's failure to do the following: protect the defendant's right to a public trial; offer alibi witnesses; present evidence of consciousness of innocence and good character; obtain and present expert forensic evidence; substantiate the motion to suppress Carlos's identification of the defendant; present evidence undermining the robbery motive; and object to the judge's instructions.

On a claim of ineffective assistance of counsel in a case of murder in the first degree, the defendant must show there was an error in the trial and that the error likely influenced the jury's decision. *Commonwealth* v. *Fisher, supra* at 353-354, citing *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992). An attorney's strategic decisions are not viewed as errors unless they are "manifestly unreasonable when made." *Commonwealth* v. *Coonan,* 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998). "We also recognize that, '[t]hroughout the course of a trial, defense counsel is called on to make numerous tactical decisions,' and therefore, '[a] list of subjective critiques of defense counsel's decisions, absent a showing that errors likely affected the jury's conclusions, is insufficient to support an ineffective assistance claim.'" *Commonwealth* v. *Fisher, supra* at 354, quoting *Commonwealth* v. *Scott,* 428 Mass. 362, 369 (1998). We conclude that there was nothing manifestly unreasonable about counsel's tactical decisions, and the defendant has failed to show that the jury's decision was likely affected by any of his claimed errors.

(a) *Failure to protect the defendant's right to a public trial.* The judge conducted individual voir dire of prospective jurors in a jury deliberation room, not in the court room. The defendant claims that his counsel was ineffective in failing to object to this procedure as a violation of the defendant's right to a public trial. While we agree with the defendant that individual voir dire should be conducted in open court, we conclude that the procedure used by the judge did not create a substantial likelihood of a miscarriage of justice, and counsel was not ineffective for failure to object on public trial grounds.

The defendant requested individual voir dire of prospective jurors, and the Commonwealth joined in that request. Individual voir dire "shall be conducted individually and outside the pres-

ence of other persons about to be called as jurors or already called." G. L. c. 234, § 28. Present during the individual voir dire in this case were the individual juror being questioned, the judge, the clerk, the defendant, counsel, the court reporter, and one or two court officers. The defendant was present throughout the voir dire and able to aid his counsel in selecting jurors. Cf. *Commonwealth* v. *Owens*, 414 Mass. 595, 602 (1993) ("defendant [had] a right to be present when jurors [were] being examined in order to aid his counsel . . . in the exercise of his peremptory challenges"). The defendant did not object to conducting voir dire in the jury deliberation room, and he never asserted that it violated his right to a public trial. As the defendant failed to preserve the issue for appellate review, we examine the procedure only to determine whether it created a substantial likelihood of a miscarriage of justice.[8]

"The right to public trial is extended to both the defendant and the public in a criminal proceeding. . . . The guarantees of open public proceedings in criminal trials cover proceedings for the voir dire examination of potential jurors concerning their qualifications to serve." *Commonwealth* v. *Gordon*, 422 Mass. 816, 823 (1996). The principal concern behind the requirement of a public trial is the assurance of fairness. *Press-Enterprise Co.* v. *Superior Court*, 478 U.S. 1, 7 (1986). The defendant, however, does not allege that the jury selection process was unfair in any respect, let alone identify some form of unfairness that would have been prevented had the voir dire been conducted in the court room.[9]

The public also "has a definite and concrete interest in seeing that justice is swiftly and fairly administered." *Gannett Co.* v.

---

[8]The defendant claims that the judge fully considered the issue in deciding the motion for a new trial, and that the issue is therefore fully preserved for appellate review. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). The judge, however, noted in his opinion that the "claims raised in the defendant's motion for a new trial that could have been raised at the trial have not been considered in the court's determination of this motion except to the extent that they are part of his argument that he was deprived of the effective assistance of counsel."

[9]As the judge noted in his decision denying the defendant's motion for a new trial, the more private setting for voir dire was of "tactical benefit[]" to the defendant, as it was "most conducive to eliciting candid responses by the jurors on possible prejudice."

*DePasquale*, 443 U.S. 368, 383 (1979). To help assure the public that the proceedings were fair, all phases of the defendant's trial, including individual voir dire, should have been held in the court room. However, the public's interest is distinct from that of the accused, and the defendant has not demonstrated that he has standing to press this right of the public. See *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 341 (1994) ("No case has been called to our attention in support of the proposition that a criminal defendant has standing to raise the First Amendment rights of members of the press or the public excluded from his trial"). In light of the defendant's consent to the procedure, his presence throughout the voir dire, and the fact that the less public setting for the voir dire in all likelihood helped rather than harmed the defendant, we find no prejudice to the defendant from the setting in which this voir dire was conducted.

(b) *Failure to offer alibi witnesses.* The defendant argues that his trial counsel erred in not calling the defendant's father and other members of his family to testify that the defendant was home by 9:45 P.M. on the night of the murders, and thus could not have participated in a shooting two miles away that did not occur until 10 P.M. In his grand jury testimony, the defendant's father had been far less precise about the time of his son's return home that night. He had in fact linked his son's return with the final quarter of a televised basketball game, the game having started at only 9 P.M., thus making it inconceivable that the defendant had returned as early as 9:45 P.M. This proposed alibi evidence from family members would also have conflicted with the defendant's own statement to police, in which he said that he had returned home at 11 P.M. Presentation of readily impeachable alibi evidence, from obviously biased witnesses, that contradicted the defendant's own statement, would not have had any impact on the jury's assessment of the overwhelming evidence that the defendant had been at the shootings.

(c) *Failure to offer consciousness of innocence and good character evidence.* The defendant argues that counsel was ineffective in failing to contact school officials who could have testified that the defendant attended school and acted normally

the day following the murders,[10] and that he had a general reputation at the high school for being a well-behaved, courteous, peaceful, and quiet person. However, according to their affidavits, these proposed witnesses could also have testified that the defendant had had an attendance problem beginning in the term prior to his arrest, and that, notwithstanding his normal demeanor the day following the shootings, he had been notably less responsive than usual in the days leading up to the crimes.

(d) *Failure to introduce expert evidence.* The defendant contends that trial counsel was ineffective in failing to retain and present additional forensic experts.[11] The defendant, however, merely speculates about other possible expert testimony that he might have been able to present. He offers no expert affidavits to support his claim that further expert testimony of help to his defense was actually available. The defendant has the burden to demonstrate that trial counsel's errors "were likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Scott*, 430 Mass. 351, 356 (1999), citing *Commonwealth* v. *Plant*, 417 Mass. 704, 715 (1994). Unsupported speculation about possible expert evidence fails to sustain this burden.[12]

(e) *Failure to suppress Carlos's identification of the defendant.* The defendant argues that trial counsel was ineffective for failing to supply a more complete affidavit in support of his motion to suppress Carlos's identification testimony. It is undisputed that Carlos, who testified that he had not met the perpetrators prior to that day and that they were only introduced

---

[10]The jury did hear evidence that the defendant was a student and that he had attended school the entire day after the shootings. Police also confirmed that, when arrested at the end of that day as he got off the school bus, the defendant made no attempt to resist or flee.

[11]The defense did present an expert witness who observed the DNA testing at Cellmark Diagnostics and criticized various aspects of that DNA testing.

[12]The speculation itself is logically unsound. For example, the defendant suggests that experts might be able to reconstruct the shooting scene and, from a more detailed analysis of the paths of the bullets, impugn Carlos's testimony as to how the shots were fired. Of course, Carlos, slumped over and hoping to be mistaken for dead, made no observations as to how, by whom, or from what position the two fatal shots were fired. Carlos testified only to what he heard after being shot in the head, and detailed expert analysis about the trajectory of the bullets would do nothing to impeach Carlos's testimony about hearing two additional shots.

to him as "Russell" and "Fred," was initially unable to identify the defendant in a photographic array. (Carlos did identify a photograph of Christian as the man who was introduced as "Fred.") Carlos testified that he was not able to identify the defendant until he saw a newspaper article concerning the defendant's arrest and arraignment that contained photographs of the defendant and Christian. Carlos was in Florida at the time, and the defendant has no evidence to suggest that the police were involved in transmitting the newspaper article to Carlos.[13]

The alleged defect in the affidavit prepared by defense counsel is its failure to provide any evidence of police involvement in Carlos's obtaining the newspaper photograph, evidence that counsel did not have and that appellate counsel still does not have. Rather, with what he had, trial counsel argued in support of the motion to suppress that the present case was comparable to *Commonwealth* v. *Jones*, 423 Mass. 99 (1996), in which we held that a highly suggestive confrontation in a court house, although inadvertent and not in any sense orchestrated by the police, could still result in suppression of identification testimony. There, however, we distinguished cases involving only "a casual confrontation in neutral surroundings, such as occur through the media." *Id.* at 109-110, citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 542 (1990). The present case involves the witness's exposure to a single newspaper photograph of the defendant. "If police have not in any way manipulated press reports, then simple exposure to the media is not sufficient ground to suppress an identification." *Commonwealth* v. *Colon-Cruz*, *supra.*[14] There is nothing to suggest that the denial of the motion to suppress was the product of any defect in counsel's presentation of that motion.

(f) *Failure to undermine the robbery motive.* The defendant argues that counsel was ineffective for failing to cross-examine witnesses and present a defense witness on the issue of the al-

---

[13]The judge noted that Carlos's father had sent him the article.

[14]The judge also noted that Carlos had been in the defendant's company for much of the evening, giving him an independent basis for identification, and that there was considerable evidence to corroborate Carlos's identification of the defendant.

leged motive for the robbery. The defendant faults counsel for failing to cross-examine one witness about supposed inconsistencies in her statements (consisting of her failure to give police information on subjects that the police did not ask the witness about), failing further to impeach another witness, and failing to call Christian's girl friend as a defense witness. The prosecution witnesses in question were cross-examined using various methods of impeachment. That trial counsel selected certain avenues of impeachment, and did not exhaust every conceivable further avenue, does not mean that counsel was ineffective. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). As to the decision not to call Christian's girl friend as a witness, the witness had little to add that would help the defense, and she would have corroborated that the defendant rode off with Christian in the victims' car. There was nothing manifestly unreasonable in the decision not to call such a witness.

(g) *Failure to object to the judge's instructions.* The defendant claims counsel was ineffective in not objecting to alleged errors in the judge's instructions, specifically, the judge's comments on the length of closing arguments, his explanation of inferences, and his instruction on attempt. The defendant has waived his first two claims by his failure to present adequate appellate argument in his brief.[15]

The defendant's argument claiming error in the failure to request further instruction on the subject of attempt is unpersuasive. The judge explained to the jury that felony-murder "includes a murder committed in the commission or attempted commission of an armed robbery with a gun," and he instructed the jury on the crime of armed robbery, but he did not separately define what was required to prove an "attempt." The crime of attempt consists of the intent to commit the underlying crime coupled with an overt act. See *Commonwealth* v. *Ortiz*, 408 Mass. 463, 470-472 (1990). In his instruction on armed robbery,

[15]An "appellate court need not pass upon questions or issues not argued in the brief." Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). In any event, these claims are without merit and fail to raise a substantial likelihood of a miscarriage of justice.

the judge instructed the jury on the intent elements of that crime, and the jury thus knew what intent needed to be proved. The defendant argues that, by failing to instruct on the topic of "overt acts," the jury did not know "how far" a defendant's actions had to go in order to constitute an overt act. He posits that the jury might have found the defendant guilty of attempted armed robbery without having found the requisite overt act. The argument borders on the frivolous. Shooting the robbery victim (and his two companions) in the head is obviously an overt act sufficient for the crime of attempted armed robbery, and the lack of further instruction on the requirement of an overt act could not have affected the jury's decision.

6. *Newly discovered evidence.* In his motion for a new trial, the defendant presented the affidavit of Andre Leotti, a high school friend of the defendant who met Carlos when both were in prison. The defendant claims that Leotti's affidavit casts doubt on Carlos's identification of the defendant and generally discredits Carlos's testimony. "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." *Commonwealth* v. *Grace,* 397 Mass. 303, 305 (1986). Leotti's affidavit adds nothing that was not already acknowledged in Carlos's own testimony.[16] We find no error in the judge's conclusion that Leotti's affidavit was consistent with and merely cumulative of the testimony at trial.

7. *G. L. c. 278, § 33E.* We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and we

---

[16]Specifically, Leotti states that Carlos admitted that he did not actually see who shot him and only concluded that it was the defendant based on his assessment of the immediate circumstances. Both Carlos and the officers to whom he gave statements testified at trial that Carlos's testimony that "Russell" was the shooter was not based on direct observation of the defendant's actually pulling the trigger, but was rather based on Carlos's drawing of an inference. Leotti also states that Carlos could not pick the defendant out of the police photographic array, a fact that was undisputed at trial. Finally, Leotti describes Carlos as a reluctant witness who was transferred within the prison system prior to his testimony. Carlos acknowledged that he was incarcerated, and testified concerning his reluctance to be known within prison as a witness for the prosecution.

see no reason to exercise our authority to reduce the jury's verdicts or order a new trial.

> *Judgments affirmed.*
> *Order denying motion for a new*
> *trial affirmed.*