Connolly, Thomas E., J.
This case arises out of the murder of Corey Skog on Thursday, March 27, 1997, by the defendant, James M. Garrey.[1] Garrey was tried in Courtroom 3 at Norfolk Superior Court from Tuesday, March 23, 1999 to Wednesday, April 7, 1999. The juiy returned a verdict of guilty of first degree murder by extreme atrocity or cruelty and the Court sentenced Garrey to a mandatory term of life imprisonment. Garrey appealed and the Supreme Judicial Court (SJC) affirmed the conviction on March 29, 2002. Commonwealth v. James M. Garrey, 436 Mass. 422 (2002). The SJC also conducted its plenary review, as required by ch. 278, §33E, and indicated as follows: “We have reviewed the entire record, the transcripts, the briefs, and the arguments. We decline to reduce the verdict or order a new trial.” Commonwealth v. James M. Garrey, 436 Mass. at 442.
On November 18, 2004, Garrey filed a Motion for New Trial. On August 30, 2006, Garrey filed a Supplemental Motion for New Trial. On February 8, 2007, the Court denied Garrey’s Motion and Supplemental Motion for New Trial and stated:
The motion for a new trial may not be used as a vehicle to compel a trial judge to review and reconsider questions of law on which the Defendant has had his day in an appellate court or foregone that opportunity. Commonwealth v. Frias, 53 Mass.App.Ct. 488, 495 (2002).
The defendant did not appeal the Court’s denials of said motions for new trial.
The present Motion for New Trial was filed on April 18, 2012 (docket no. 98) and claims that the alleged closure of the courtroom during the three-hour impanelment requires that Garrey be granted a new trial. On June 8, 2012, the Court held a nonevidentiaiy hearing on this motion. The Court notes that this Motion for a New Trial was filed thirteen years and eleven days from the date that the jury returned its guilty verdict and ten years and twenty days from the date of issuance of the SJC’s opinion affirming the judgment of conviction.
Background
Prior to impanelment, the Court stated on the record:
We’re ready for our juiy, please. We’re going to have to ask the folks in the back to sort of clear out and then they can come back in after the jury is impaneled.
This statement was not made by the Court for the purposes of closing the courtroom to family and friends of the defendant or to any members of the public. It was done for the sole purpose of having room for the prospective jurors in order to accomplish the impanelment.
The Court accepts counsel for the defendant’s statement in his Memorandum that “at least sevenly-seven jurors were present during jury selection, forty-eight of which were excused as selection proceeded.”[2] Courtroom 3 at Norfolk Superior Court is the first courtroom on the right on the first floor after a person enters the front door of the courthouse. Courtroom 3 has seats for no more than 55 potential jurors.[3] This includes the bench seats, the 16 seats in the jury box, three more single seats near the wall on the entrance side of the courtroom, and two additional seats against the wall on the far side of the courtroom. Assuming the correctness of the defendant’s figure that at least 77 jurors were present during jury selection, it means that 22 jurors were standing during the general questions of the juiy.
After the Court asked its general questions to the group of jurors as a whole, the Court started seating jurors in the juiy box. Thus, the 16 prospective jurors seated in the juiy box were asked to leave the jury box and stand at some available place in the back of the courtroom (at or near the areas where the other 22 jurors were standing) .[4] The individual juiy voir dire in this case was (1) done at the request of both parties; (2) at side bar; (3) with the defendant present so as to be able to consult with his attorney; (4) with all the other remaining jurors sitting or standing in the courtroom; and (5) with none of the defendant’s family or friends or members of the public present in the courtroom. Jurors left the courtroom when they were excused. If a seated juror was being excused or was asked to take a seat in the jury box, another juror who was standing would be seated in their vacated seat.
For a first degree murder case, the impanelment of the case went smoothly and quickly and was com *138 pleted in approximately three hours (namely from 12:15 p.m. to 3:15 p.m., with no lunch).
Discussion
Under Mass.R.Crim.P. 30(b), a judge may grant a new trial only “if it appears that justice may not have been done.” Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992), quoting Commonwealth v. DeMarco, 387 Mass. 481, 482 (1982), and cases cited. “Judges are to apply the standard set forth in Rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth.” Commonwealth v. Wheeler, 52 Mass.App.Ct. 631, 635, 636 (2001), citing Fanelli, 412 Mass. at 504.
In evaluating the evidence, the Court must bear in mind that the burden is on the defendant to prove any closure of the courtroom and that the burden is on the Commonwealth to prove waiver by the defendant of his Sixth Amendment right to a public trial. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 107 (2010); Commonwealth v. Lavoie, 80 Mass.App.Ct. 546, 553 (2011).
The key issue involved here is a lack of space in the courtroom to accommodate all 77 potential jurors and the defendant’s family and friends and members of the public during the individual voir dire and impanelment of the jury. “The right to public trial is extended to both the defendant and the public in a criminal proceeding... The guarantees of open public proceedings in criminal trials cover proceedings for the voir dire examination of potential jurors concerning their qualifications to serve.” Commonwealth v. Horton, 434 Mass. 823, 832 (2001), quoting Commonwealth v. Gordon, 422 Mass. 816, 823 (1996); see Commonwealth v. Dyer, 460 Mass. 728, 735 (2011); Globe Newspaper Co. v. Commonwealth, 407 Mass. 879, 884 (1990) (“The public’s right of access extends to voir dire proceeding concerning individual potential jurors”).
The Court concludes based on all the evidence in the record that the courtroom was closed during impanelment, which lasted approximately three hours (12:15p.m. to3:15p.m.), including the individual voir dire.
The public trial right is not absolute, however, and in limited circumstances a court may bar spectators from certain portions of a criminal trial. Cohen (No. 1), 456 Mass. at 107. To do so, a judge must make a case-specific determination that closure is necessary, which “must satisfy four requirements articulated by the Supreme Court: [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.” Cohen (No. 1), 456 Mass. at 107, quoting Waller v. Georgia, 467 U.S. 39, 48 (1984) [Waller applies “to the exclusion of the public from jury selection proceedings, at least when this occurs over the defendant’s objection”).
In Cohen (No. 1), 456 Mass. at 114, the SJC discussed the issue of when insufficient space may provide a valid reason for the exclusion of the public during at least some part of jury impanelment proceedings. Specifically, the SJC stated:
We recognize that in court houses across the Commonwealth, insufficient space may well provide a valid reason for the exclusion of the public during at least some part of jury impanelment proceedings, because the number of prospective jurors in the venire are likely to fill all or almost all of the available seats. It is not required that every seat not occupied by a prospective juror must be made available to the public; as noted, the possibility that jurors may be influenced or tainted by intermingling with spectators is a valid concern that may justify excluding members of the public until space permits them to sit apart from the prospective jurors. Moreover, the judge or court officers need not undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats. But the public trial right applies with full force during impanelment . . . and if space in the courtroom becomes available, the judge must make sure that members of the public [or family] who wish to observe the proceedings are not prevented from doing so.
Cohen (No. 1), 456 Mass. at 114 (emphasis in original).
Here, the reason for the exclusion of the defendant’s family and friends and the general public was that there was insufficient room in the courtroom. The Court obviously made at least an implicit finding that there was insufficient seating as there were 77 prospective jurors and only 55 available juror seats. After the Court’s general questioning of the jury panel, the jury box was emptied of its 16jurors, who had to stand with the other 22 standing jurors. Therefore, at the commencement of individual voir dire, there would have been 39 prospective jurors seated in the courtroom and 38 prospective jurors standing. There simply was no space for any more standee persons in that courtroom.
The Court determined that interested persons or members of the public would have to wait until the jury was seated before they would be free to re-enter the courtroom.[5] There was absolutely no objection made to the Court concerning the procedure that the Court proposed to use and did use during the impanelment of the jury, namely there was no objection by defendant’s counsel, the defendant himself, the Assistant District Attorney, or any member of the defendant’s family. The closing of the courtroom was justified due to the overcrowding by the number of prospective jurors and the very limited amount of space in the courtroom. See id. at 113 (‘To the extent that there were insufficient seats in the court room for *139 all the spectators, excluding those who could not be appropriately seated was permissible”), citing Estes v. Texas, 381 U.S. 532, 588-89 (1965) (Harlan, J. concurring) (“Obviously the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats”), and United States v. Shryock, 342 F.3d 948, 974-75 (9th Cir. 2003), cert. denied, 541 U.S. 965 (2004) (no violation of defendant’s Sixth Amendment public trial right where on two occasions during trial, insufficient seating space prevented some of the defendant’s family from being in the courtroom).
In addition, the first time in this case that an objection to the procedure followed by the Court was made by the defendant was 13 years after the jury rendered its guilty verdicts and 10 years after the affirmance of the judgment of guilty by the SJC, which included its Ch. 278, §33E review. The defendant did not address the issue when he appealed the jury’s guilty verdict immediately after his conviction or in his 2004 Motion for New Trial or 2006 Supplemental Motion for New Trial.
A violation of the right to a public trial is a structural error and not susceptible to harmless error analysis. Cohen (No. 1), 456 Mass. at 105. The Court, however, can consider “whether the defendant raised the issue in a timely manner because ‘the right to a public trial like other structural rights can be waived.’ ” Id. at 105-06, quoting Commonwealth v. Edward, 75 Mass.App.Ct. 162, 173 (2009). Unlike the waiver of the right to counsel, the waiver of public trial rights does not have to be memorialized in a colloquy. Dyer, 460 Mass. at 735-36. Further, the waiver does not have to be knowing, voluntary, or intelligent. See Commonwealth v. LaChance, Cr. No. 1996-1654 (Middlesex Super.Ct. March 28, 2012) (29 Mass. L. Rptr. 553] (Brassard, J.), citing Dyer, 460 Mass. at 734-37 and n.7 (holding that defendant waived his public trial claim because he did not object to his family’s removal at the time of impanelment, during the balance of trial, on appeal, or in connection with his two prior motions for new trial). But see Edward, 75 Mass.App.Ct. at 173 (waiver analysis requires assessment of whether at the time the closure occurred, defendant knowingly, voluntarily, and intelligently agreed to closure).[6]
Here, the defendant heard the court state that the “folks in the back” would have to “sort of clear out” at the start of jury impanelment. Nevertheless, he did not object at that time nor during the balance of his trial, on appeal, or in connection with his two prior motions for a new trial. Thus, the court concludes that the defendant waived his public trial claim. See Dyer, 460 Mass. at 734-37, n.7, and n.8; Horton, 434 Mass. at 831-33.
The defendant also claims that his trial counsel, J.W. Carney, Jr., Esq. and Andrew M. D’Angelo, Esq., rendered ineffective assistance of counsel by not objecting to the closing of the courtroom during jury impanelment.
“(W]hen the claim of ineffectiveness is predicated ... on counsel’s failure to object to something that occurred at trial, the standard for evaluating the ineffectiveness claim is not significantly different from the substantial risk standard.” Commonwealth v. Azar, 435 Mass. 675, 686 (2002). A substantial risk of a miscarriage of justice exists when the court has “a serious doubt whether the result of the trial might have been different had the error not been made.” Id. at 687. “Errors of this magnitude are extraordinary events and relief is seldom granted. Such errors are particularly unlikely where, as here, the defendant’s conviction in a capital case has undergone the exacting scrutiny of plenary review under §33E.” Commonwealth v. Randolph, 438 Mass. 290, 297 (2002); see also Commonwealth v. Smith, 460 Mass. 318, 320-21 (2011) (“Moreover in a capital case, issues raised in a postappeal motion for a new trial that were or could have been raised at trial or in the direct appeal are to be measured by the substantial risk of miscarriage of justice standard”).
In analyzing a claim under the substantial risk standard, the court reviews the evidence and the case as a whole and asks four questions: (1) Was there error? (2) Was the defendant prejudiced by the error? (3) Considering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict? (4) May the court infer from the record that counsel’s failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision? Commonwealth v. Randolph, 438 Mass. at 297-98; Commonwealth v. Miranda, 22 Mass.App.Ct. 10, 21 (1986) (“Where evidence of guilt is strong and one-sided, it is generally concluded that no substantial risk exists of a miscarriage of justice”). Only if the answer to all four questions is “yes” may the court grant relief. Randolph, 438 Mass. at 298.
Answer No. 1
The Court believes that there was no error because there was no objection by defendant’s counsel or the defendant to the impanelment procedure used, not only at trial, but for the next 13 years until this motion was filed.
Answer No. 2
Assuming defendant’s counsel did make an error in not objecting to the Court’s impanelment procedure, there does not appear to be any prejudice to the defendant. Nothing in this case would have been any different regarding the evidence presented to the jury or the jury verdicts had the family members been present during impanelment. The evidence of guilt was very strong against the defendant as there were direct eyewitnesses to the stabbing. There was evidence that the defendant inflicted a three-inch knife wound di *140 rectly into Skog’s heart after beating him soundly with his fists. Then as Skog was lying on the floor conscious after the stabbing, in pain, and shaking, the defendant kicked him with his boots up to three times in the head — hard enough to cause his head to bounce off the wall twice. The defendant then ran from the scene into the bar’s parking lot, chased by witnesses who literally had to sit on him until the police arrived to prevent him from running away. See Miranda, 22 Mass.App.Ct. at 21 (1986).[7]
Answer No. 3.
The Court answers that assuming there was an error, said error had no material influence on the verdict.
Answer No. 4.
The Court has no factual basis to answer this question.
Therefore, the Court concludes that Garrey has not shown a substantial risk of miscarriage of justice and his motion does not raise any issues requiring a new trial.[8]
ORDER
After hearing and review of all submissions, the Defendant, James M. Garrey’s, Motion for a New Trial is DENIED.

 The facts are set out in detail in Commonwealth v. James M. Garrey, 436 Mass. 422 (2002).

 The Court notes that the number could well have been higher than 77 prospective jurors.

 First Assistant Clerk Mary K. Hickey and Assistant Clerk Joseph P. Hurley, at the request of the Court, have counted the available seats for prospective jurors in Courtroom 3. The Court notes that Attorney J.W. Carney and Attorney Andrew D’Angelo both refer to Courtroom 3 with the exact same sentence in their affidavits (‘This is a large courtroom”) (D’Angelo at p. A176, par. 3 and Carney at p. A178, par. 2). Evidently, they never counted the available seating.

 That would mean that there were 39 potential jurors seated and 38 potential jurors standing.

 The Court can only speculate as to when, during the impanelment process, seats, sufficiently segregated from the remaining prospective jurors, become available for members of the family or the public. The Court’s best estimate would be between 2:30 p.m. to 3:15 p.m. from reading the transcript of the impanelment.

 Judge Brassard determined that the SJC was moving away from the standard set out in Commonwealth v. Edward, 75 Mass.App.Ct. 162, 173 (2009), that a waiver analysis required the assessment of whether at the time the closure occurred, the defendant knowingly, voluntarily, and intelligently agreed to the closure, because in Commonwealth v. Dyer, 460 Mass. 728, 734-37 (2011), the SJC did not discuss whether defendant knowingly, intelligently, and voluntarily waived his right to public trial, instead focusing on whether defendant was aware of the closure and capable of objecting to it. In addition, in Dyer, 460 Mass. at 735 n.7, the SJC cited Commonwealth v. Horton, 434 Mass. 823 (2001), where the Court concluded that the defendant had waived his claim because he did not object to the judge’s actions and therefore failed to preserve the issue for appellate review.

 The defendant claims that he need not satisfy the prejudice portion of the analysis because denial of a public trial is a structural error. In Dyer, however, the court, in the context of a defendant’s direct review, applied the substantial likelihood of a miscarriage of justice analysis. Dyer, 460 Mass at 737. See also Commonwealth v. LaChance, Cr. No. 1996-1654 (Middlesex Super. Ct. March 28, 2012) (Brassard, J.) (29 Mass. L. Rptr. 553].

 In addition, the defendant has failed to show that an evidentiary hearing would serve any legitimate purpose. See Mass.R.Crim.P. 30(c)(3) (decision whether to hold evidentiary hearing rests solely with judge who can rule on motion, without evidentiary hearing, “if no substantial issue is raised by the motion or affidavits”); Commonwealth v. Goodreau, 442 Mass. 341, 348-49 (2004) (“If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary hearing to have the witnesses repeat the same evidence will accomplish nothing”).