Gants, J.
The plaintiff, Joseph Sylva (“Sylva”), has brought suit against the defendant, Dr. Douglas Anthony (“Dr. Anthony”), alleging that Dr. Anthony, a neuropathologist, was negligent in failing to accurately diagnose a frozen section of Sylva’s brain tissue that Dr. Anthony was provided while Sylva was undergoing brain surgery.[1] Immediately prior to trial, Sylva moved to allow attorney voir dire of the juiy venire. This Court orally denied that motion, but conducted extensive judicial voir dire, including partial individual voir dire. Since the appropriateness of attorney voir dire is presently a matter of substantial controversy, and since there is the possibility of an appeal of this Court’s denial of the plaintiffs request for attorney voir dire, this Court will articulate its reasons for the denial in writing.
The Rationale for Attorney Voir Dire
Sylva, like many proponents of attorney voir dire in Massachusetts, observes that civil plaintiffs have a significantly lower success rate in Massachusetts than in most of the rest of the nation. A Civil Justice Survey of State Courts for the year 1992, conducted by the Bureau of Justice Statistics of the United States Department of Justice, found that plaintiffs succeeded at trial in 51.8 percent of the 12,000 state court jury trial cases in the nation’s 75 largest counties. Bureau of Justice Statistics, U.S. Dept. of Justice, Civil Justice Survey of State Courts1992, Civil Jury Cases and Verdicts in Large Counties (July 1995) at page 4, Table 5. Of the counties surveyed in Massachusetts, however, the plaintiff success rate was significantly lower:
Essex 30.3 percent
Middlesex 34.1 percent
Norfolk 50.0 percent
Suffolk 35.1 percent
Worcester 37.7 percent
Id. at page 13, Appendix table 2. Indeed, of the 45 counties for whom results were included in the survey, apart from four of the five largest counties in Massachusetts, only Honolulu, Hawaii and San Bernardino, California had plaintiff success rates below 40 percent *338 in 1992. Id. There is no reason to believe that 1992 was an anomaly in this regard. In 1996, of these same 45 counties in the United States, the five largest counties in Massachusetts ranked from 36th in plaintiff success rate (Essex County) to 45th (Norfolk County). Bureau of Justice Statistics, U.S. Dept. of Justice, Civil Justice Survey of State Courts, 1996 Civil Jury Trials and Cases in Large Counties (September 1999) at page 21, Appendix C.[2]
Of the many reasons that potentially may explain plaintiffs’ lower success rate in Massachusetts, Sylva focuses on only onethe absence of attorney voir dire in Massachusetts. Sylva does not provide any statistical data that demonstrates a significant correlation between plaintiff success rates and the availability of attorney voir dire, let alone attempt to take into account the multiple other variables that may also be correlated with plaintiff success rates. In short, there is nothing to demonstrate that the relatively low success rate of plaintiffs in Massachusetts can be significantly attributed to the absence of attorney voir dire rather than to a host of other possible variables.
Nor, when one thinks about it, is it obvious that there would be a significant correlation between the availability of attorney voir dire and either the percentage or the size of plaintiffs’ verdicts. Attorney voir dire would not simply permit plaintiffs’ counsel to question prospective jurors; defense counsel would have the same opportunity. Additional information about jurors may help plaintiffs’ attorneys exercise their peremptory challenges more wisely to exclude jurors unlikely to favor their position, but it will provide equal help to defense attorneys.
Assuming that attorney voir dire were to succeed in giving counsel fair more information about jurors than they presently have, attorney voir dire would help plaintiffs more than defendants only if:
more prospective jurors in the venire were biased against plaintiffs than against defendants, so the additional information is more likely to reveal jurors biased against plaintiffs than jurors biased against defendants;
the jury venire was equally biased but attorney voir dire was more effective at uncovering bias against plaintiffs; or
plaintiffs’ áttorneys, when armed with more information about jurors, would exercise their peremptory challenges more wisely than defense attorneys.
Sylva adopts the first proposition, contending essentially that the advertising efforts of the insurance industry have successfully produced substantial bias against plaintiffs by convincing the general public (and, consequently, prospective jurors) that successful tort plaintiffs victimize them through increased product prices and insurance premiums. Sylva specifically contends that jurors are especially biased against plaintiffs in medical malpractice cases because they believe that plaintiffs’ verdicts, especially generous plaintiffs’ verdicts, mean higher medical malpractice insurance premiums which, in turn, mean higher health insurance premiums and medical bills to them.
Sylva has presented no empirical evidence to support his argument that jurors have been influenced by the insurance industry to favor defendants. Indeed, it would be surprising if many jurors, in evaluating whether a doctor was negligent in a particular case, would think through the fourth order indirect effect of a verdict upon them personallythat plaintiffs’ verdicts increase the costs of medical malpractice insurers, which leads to increases in medical malpractice premiums, which leads to increased overall costs to retain physicians, which leads to higher health insurance premiums and medical bills. As discussed later in this Memorandum, when prospective jurors in this case were individually asked a question that would elicit such sentiments"Do you have any feelings about lawsuits brought by patients against doctors alleging medical malpractice that would affect your ability to be fair and impartial in this case?"virtually no one expressed these views. Far more jurors expressed sentiments that reflected possible bias in favor of the plaintiffsthat they or someone close to them had some prior experience with what they perceived to be shoddy medical care that warranted compensation but received none.[3]
Even if this Court were to assume that many jurors have been biased against plaintiffs by the insurance industry, it is not at all apparent that the best way to expose this bias (or to cure it) is to permit plaintiffs’ attorneys to ask questions of jurors that essentially will communicate to them that the defendant has medical malpractice insurance and the medical malpractice insurer, not the doctor personally, will pay any verdict. Generally, unless offered to prove agency, ownership, control, or bias, the law bars an attorney from telling the jury that the defendant is insured for the negligence alleged. McDaniel v. Pickens, 45 Mass.App.Ct. 63, 66 (1998). See also Shore v. Shore, 385 Mass. 529, 531 (1982). The reason for barring evidence of insurance coverage is that, unless offered for one of the reasons outlined above, it is irrelevant to any of the factual issues properly before the jurywhether the defendant was negligent, whether any negligence caused injury, and the amount of damages that will fairly compensate the plaintiff for the injury caused by the plaintiffs negligence. See Shore v. Shore, 385 Mass. at 532 (“Insurance coverage was irrelevant”). Massachusetts courts have expressed concern about the risk of “untoward animus or confusion” that may be engendered “by the injection of the troubling rogue factor of insurance.” McDaniel v. Pickens, 45 Mass.App.Ct. at 67. The primary concern has been that a jury, once it learns that the defendant is insured, may be more prone to allow its sympathy for the plaintiff to influence its verdict, since the *339 defendant’s insurer and not the defendant will pay the verdict. “Exposing jurors to such information is condemned because it is not in itself probative of any relevant proposition and is taken to lead to undeserved verdicts for plaintiffs and exaggerated awards which jurors will readily load on faceless insurance companies supposedly paid for taking the risk.” Goldstein v. Gontarz, 364 Mass. 800, 808 (1974). Itmakesno sense to bar the plaintiff from offering evidence of insurance coverage at trial, but to permit the attorney for the plaintiff during attorney voir dire to ask questions that clearly communicate that the defendant in this case is covered by insurance.
Similarly, counsel during closing argument are barred from making the jury feel as if they have been victimized by the conduct of any party. See generally Commonwealth v. Ward, 28 Mass.App.Ct. 292 (1990). Yet, by asking during attorney voir dire whether the juror believes that he or she will ultimately be victimized by a plaintiffs’ verdict, plaintiffs’ counsel essentially suggests a causal link that the attorneys are forbidden to make during trial and that most jurors would be unlikely to make by themselves.[4]
Stripped to its core, Sylva’s argument in favor of attorney voir dire rests on the unproven assumption that prospective jurors are more likely to be biased against plaintiffs than defendants because the advertising efforts of the insurance industry have succeeded in persuading prospective jurors that, as consumers, they have a financial stake in the outcome of the case. Having assumed a problem, he then proposes a solution that essentially involves permitting attorneys to question prospective jurors about their beliefs regarding the long-term consequence of plaintiffs’ verdicts. For all but the dullest jurors, this questioning inevitably will communicate to them information that they are generally barred from learning at trialthat the defendant is insured and his insurance company will be responsible to pay any verdict. While such questioning may cause some jurors to reveal a bias against plaintiffs that would otherwise go undetected, it may divert the attention of other jurors to the question of who will ultimately pay the verdict, which will cause them to recognize that an insurance company will likely pay and, perhaps, lead them to consider how the volume and amount of plaintiff verdicts will affect their own medical costs or insurance premiums. Consequently, the attorney voir dire envisioned by Sylva is as likely to engender bias as to expose it.
The Logistics of Attorney Voir Dire
Sylva proposes that the Court follow its usual procedure in seating fourteen disinterested jurors in the juiy boxask the standard questions of the entire venire, then call jurors individually to take their seats in the jury box, speaking at side bar to those who raised their hand to any question, and excuse jurors, either sua sponte or by motion of any party, who must be removed for cause. Then he proposes that the seated jurors be brought, one at a time, to the Court’s lobby or a jury deliberation room, where the attorneys, in the presence of the Court, on the record, will have roughly five minutes to ask questions of each juror.[5] After all fourteen seated jurors have been questioned in this fashion by the attorneys, the attorneys will exercise their peremptory challenges. The seats of the jurors who are thus removed shall be filled, and these new jurors will be questioned by the attorneys in the same fashion. This procedure shall continue until either the attorneys are content with the panel of fourteen or run out of peremptory challenges, whichever comes first.
Sylva acknowledges that this type of voir dire “will add some time to the jury selection, but that is not too much to ask.” In determining whether it is indeed “too much to ask,” it is important to consider just how much time the proposed attorney voir dire would add to jury selection. Assuming that the attorney questioning of each juror would truly only take five minutes,[6] the questioning of the fourteen jurors who were initially seated would take seventy minutes alone. If the attorneys used all forty of their peremptory challenges,[7] the attorney questioning of jurors would take 270 minutes4.5 hours. If only half of the peremptories were used, the attorney questioning of jurors would take 170 minutesnearly three hours. It would take even longer if any juror was removed for cause as a result of the attorney questioning.
In Suffolk County, where this case was tried, civil cases sometimes need to wait for one or two days for a jury venire. These delays occur because criminal cases, absent special arrangements, generally take precedence and there are usually too few jurors available in the pool to be split among two trials simultaneously. Therefore, the second case on the jury list generally has to wait for the first to complete jury selection before it can receive jurors.[8] Even if a civil case gets jurors first, the venire rarely arrives in the courtroom before 10 a.m. Adding even two hours to jury selection would mean that the same jury venire generally could not be used for two trials, because there would be too little time in the day after the first jury selection to allow the venire to be sent to another courtroom for another jury selection. Stated differently, a jury venire that could have been used to select two fourteen person juries will now be able to select just one jury. Adding four hours to jury selection would make it extremely difficult to select fourteen jurors in even one case in a single day, meaning that prospective jurors would need to return for a second day of jury selection.
If attorney voir dire were to be routinely allowed in civil cases in Suffolk County, the inevitable consequence would be that the already substantial delays in obtaining a jury venire and commencing trial would become even more substantial. No litigant should have to wait two or three days before a jury can become *340 available. Not only does this waste the time of the attorneys, the parties, and the witnesses who have appeared expecting that trial will begin, but it can wreck havoc on the trial planning of an attorney who has carefully arranged for busy witnesses, especially expert and out-of-town witnesses, to be available on particular days. In many cases, it means that the trial itself has to be postponed to a later date, because the delay has produced time conflicts with the attorneys’ and key witnesses’ other commitments that cannot be resolved. In short, if attorney voir dire were routinely allowed, it would mean that fewer civil cases could be tried in Suffolk County in any given year, that these cases would on average take at least a half day longer to try, and that many more of these cases would wait between one and three days to obtain a jury venire. It is already difficult to get a reliable trial date in Suffolk County in any session other than the Business Session and, even with such a date, to start trial on the date set because of the shortage of available jurors. Attorney voir dire would make these serious problems worse.
It would be wonderful if this problem could be addressed by adding more jurors to the jury pool, but Suffolk County already is strapped for jurors, because it combines a higher per capita demand for jurors with a significantly higher percentage of no-shows than other counties. Therefore, it is unrealistic to expect that the adverse impact of adding hours to jury selection and reducing the ability to use a jury venire in more than one trial could be eliminated or even significantly diminished by bringing in more jurors each day to the courthouse.
If the additional time spent in jury selection were necessary to ensure a fair trial, these adverse consequences would need to be borne. Certainly, in unusual cases, where because of pretrial publicity or the sensitivity of the issues being adjudicated there is a substantial risk of juror bias, a substantial additional investment of time spent in voir dire may be necessary to ensure a fair trial.[9] The question is whether, in the vast majority of cases that are not unusual, including the case at bar, attorney voir dire (at least the version proposed by Sylva) so significantly improves the fairness of the jury trial by reducing the risk of juror bias that it is worth these considerable costs.
A Balanced Alternative to Attorney Voir Dire
Although Sylva has provided no empirical evidence that prospective jurors are more likely to be biased against plaintiffs (particularly plaintiffs who are patients) than against defendants (particularly defendants who are doctors), this Court will assume for purposes of this decision that this risk of bias is large enough that it deserves to be addressed. Recognition of this risk, however, does not logically lead to attorney voir dire as its cure. Sylva poses a false dichotomy by presenting the choices as either attorney voir dire or no voir dire. Rather, before concluding that attorney voir dire is the answer, one must ask the question whether attorney voir dire is more likely to be effective in uncovering juror bias than alternative forms of voir dire, specifically more extensive voir dire conducted by the Court.
In this case, in lieu of attorney voir dire, I asked the entire venire, above and beyond the standard jury questions, the following questions:
Have you, a member of your immediate family, or any close personal friend ever undergone an operative procedure or surgery involving the brain?
Have you or any member of your immediate family or any close personal friend ever been treated for the medical condition of Multiple Sclerosis, also known as MS?
Have you or any member of your immediate family or any close personal friend ever suffered an injury which you believed occurred as a result of medical negligence or medical malpractice, and contemplated or threatened or brought a law suit against the doctor or other medical provider who you believe was negligent or engaged in medical malpractice?
I will now turn that question around and ask whether you or anybody close to you or any member of your immediate family is in the medical field or a field that is in some fashion associated with medicine, and had a lawsuit either brought or threatened against you or them as a result of a claim of medical negligence or medical malpractice?
Are you now or have you ever been employed in the provision of health or medical care?
Is there anything about the nature of this case, that is, a case involving an allegation by a patient and by members of that patient’s family that a doctor was engaged in medical negligence, also referred to as medical malpractice, that would interfere with your ability to be a fair and impartial juror?
All those jurors who raised their hand to any of these (or the other) questions were further questioned about their affirmative answers at side bar after their name was called and before they entered the jury box. In addition, every juror, regardless of whether he or she answered any question in the affirmative, was brought individually to side bar, where I asked them, “Do you have any feelings about lawsuits brought by patients against doctors alleging medical malpractice that would affect your ability to be fair and impartial in this case?” If the answer was “yes,” I asked follow-up questions.
When questioned individually, virtually no juror expressed the view that he disliked these lawsuits because he thought they ultimately increased his health insurance premiums or his medical costs. Far more jurors said that they or someone close to them had some prior experience with a doctor in which the medical care was somehow deficient, the medical result was worse than it should have been, and, as a *341 result, they harbored some bitterness towards the medical profession.
It is true that the question asked individually simply invited prospective jurors to volunteer such feelings. It did not confront them with hypothetical feelings or points of view and ask them whether they adopted them. While it did not ensure that jurors had addressed particular feelings or points of view, it also did not invite jurors to consider feelings or points of view that they may not otherwise have considered in the absence of pointed questioning. This has the virtue, at least to some degree, of exposing potential juror bias without generating new juror bias. To that extent, this form of questioning is preferable to attorney voir dire in that, to paraphrase the Hippocratic oath, it does no harm.
One can debate, without reasonable hope of resolution, whether this form of questioning was more or less likely than attorney voir dire to elicit latent juror bias. I believe that it was at least equally effective, but I have no more empirical support for this proposition than Sylva can muster for his different view. What I believe is less debatable is that, when one considers the far greater amount of time needed for attorney voir dire (with all that means for the administration of justice in busy courts) and the risk that the questions asked by counsel will instill bias as well as reveal it, this more extensive judicial voir dire is a far better solution to alleviate the risk of juror bias in the Superior Court than the attorney voir dire suggested by Sylva.[10]
Attorney voir dire, especially lengthy attorney voir dire, may reveal juror bias, but it is more likely to be used to allow counsel more accurately to determine which jurors will be favorably (or unfavorably) disposed towards their arguments so that they can choose a jury more likely to reach the verdict they seek. This Court understands why many counsel may want to improve their ability to choose a sympathetic jury, but the Court’s interest is in dispensing justice fairly and equitably, not in helping attorneys tilt juries in their favor. Every party is entitled to a fair and impartial jury, not to a favorable jury.
The fact of the matter is that, if attorney voir dire (at least the version proposed by Sylva) were to become the norm in civil cases, it would result in less, not more, justice in this Commonwealth. Fewer civil cases would be tried; the delay in obtaining a true trial date would become even worse; and trials, at least in Suffolk County, would be even less likely to start on the true date. Concerns regarding latent juror bias are more efficiently and equally effectively addressed through more extensive judicial voir dire because such questioning takes far less time and poses a far lower risk of instilling juror bias.

 Sylva’s wife and two children are also plaintiffs, each having brought a consortium claim against Dr. Anthony.

 Sylva also points to Judge Patrick Brady’s compilation of the outcome of personal injury cases over which he has presided from January 1, 1993 through March 31, 2001 to support his contention that plaintiffs fare badly in Massachusetts. Of the 112 cases that Judge Brady tried during this period, the plaintiffs “won” in only 12. However, it must be noted that Judge Brady defined a plaintiffs “win" as a verdict that was greater than the defendant’s settlement offer. Therefore, a plaintiff was deemed to have “lost” in Judge Brady’s survey both when the jury found in favor of the defendant and when it found in favor of the plaintiff, but awarded the plaintiff less money than the settlement offer the plaintiff had rejected. Hon. Patrick Brady, “Judges’ Tort Stats Show Defendants Usually Win,” 29 Massachusetts Lawyers Weekly 2103 (May 29, 2001).

 In a motor vehicle negligence case that I recently tried, far more jurors during voir dire linked the overall success of plaintiffs to the amount they pay in automobile insurance premiums. It should not be surprising that more jurors make this linkage in a motor vehicle negligence case than in a medical malpractice case, because the relationship is more directvirtually all jurors purchase automobile insurance but few pinchase medical malpractice insurance. Those jurors who made this connection, however, expressed anger only at those plaintiffs who brought frivolous claims, not at those who legitimately were seriously injured because of the negligence of another driver. Therefore, it is not obvious that this potential bias would have any significant effect on jurors’ evaluation of the evidence, because virtually all of these jurors, after inquiry, expressed confidence that they could fairly distinguish between the legitimate and the frivolous negligence claim.

 When jurors in such cases have been asked the question mandated by statute as to whether they have any financial or other interest in the outcome of this case, no juror in any case I have tried has ever claimed to have a financial interest in the manner suggested by plaintiffs’ counsel.

 It would be inappropriate and, perhaps, unconstitutional to conduct jury selection in a civil case in any location other than a courtroom, since the public and the litigants enjoy the right to apublic trial. See Commonwealth v. Horton, 434 Mass. 823, 830-33 (2001). It would certainly be unconstitutional in a criminal case. Id. Therefore, attorney voir dire of jurors would need to be conducted either at side bar or, if all other jurors in the venire could wait outside the courtroom, with the juror on the witness stand.

 This estimate is almost certainly an underestimate. Sylva alone proposes to ask each juror ten questions, including some that do not lend themselves to simple answers, such as, “Do you think lawsuits against doctors are bad for our society?” If defense counsel were to ask a similar number of questions, as fairness would dictate, it is difficult to imagine that such a conversation would be completed in just five minutes.

 According to the Supreme Judicial Court’s interpretation of Mass. Civ. R. Proc. 47(b), each side is entitled to twenty peremptory challenges because there are four plaintiffs, each of whom is entitled five peremptories apiece, and the defendant is entitled to the same aggregate number of peremptories enjoyed by the plaintiffs. See Demoulas v. Demoulas, 428 Mass. 555, 559 n.5 (1998). In the absence of stipulation, the plaintiffs may not be ordered to share their peremptories. Id. Here, the Sylvas refused to agree to any reduction in their number of peremptories.

 At times, a jury venire may be sent to the second case before jury selection in the first case has been completed. In Suffolk County, there are usually between 90 and 110 jurors available each day in the pool. If close to 110 jurors are available, and the first case asks for a venire of 70 jurors while the second case needs a venire of only 60 jurors, the jury pool *342 officer may be able to send a venire to the second case once some of the jurors from the first case have returned to the jury pool but before jury selection in the first case has finished.

 As discussed below, this additional investment of time need not arise from attorney voir dire. It may also arise from individual voir dire conducted by the judge.

 This Court acknowledges that there may be other ways to conduct attorney voir dire that do not pose the formidable problems posed by Sylva’s version. This decision does not attempt to evaluate those alternatives.