## COMMONWEALTH vs. CHARLES P. DYER.

Bristol. May 6, 2011. - October 13, 2011.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Jury and Jurors. Practice, Criminal,* Public trial, Voir dire, Confrontation of
witnesses, Jury and jurors, Presence of defendant, Interrogation of jurors,
Challenge to jurors, Instructions to jury, Assistance of counsel, Capital
case. *Constitutional Law,* Public trial, Waiver of constitutional rights,
Confrontation of witnesses, Jury, Assistance of counsel. *Waiver. Due Pro-
cess of Law,* Presence of defendant in courtroom. *Evidence,* Relevancy and
materiality, State of mind, Offer of proof, Prior misconduct. *Homicide.
Malice. Self-Defense.*

This court declined to order a new trial for a criminal defendant, where although
the judge's questioning of prospective jurors one at a time in her lobby in
the presence of the defendant, counsel for both sides, the court reporter, and
the court clerk implicated the defendant's right to individual voir dire in
open court, the defendant waived his rights guaranteed by the First and Sixth
Amendments to the United States Constitution by consenting to the process.
[734-737]

At a murder trial, no reversible error arose from separate conversations that
the judge had with various jurors [737-739], and no substantial likelihood
of a miscarriage of justice arose from the judge's response to questions
from the jury [739-740].

The judge at a murder trial did not err in denying a motion for a posttrial evi-
dentiary hearing on potential juror bias, where the judge had adequately
explored potential bias issues with regard to one juror, and where, with
respect to another juror, the defendant did not sustain his burden to show
pretrial bias. [740-741]

At a murder trial, no substantial likelihood of a miscarriage of justice arose
from the admission of evidence that the victim's family was afraid of the
defendant, where such evidence was relevant to rebut the defendant's
testimony regarding the events on the day in question, in that the defendant
sought to portray the family as a whole as the aggressor [741-743]; likewise,
no error arose in excluding evidence about two conversations the defend-
ant had with the victim, where the defendant made no offer of proof at
trial or in his motion for a new trial regarding the conversations [743-744];
further, no substantial likelihood of a miscarriage of justice arose from the
admission of certain testimony that implied a pattern of prior bad acts on
the part of the defendant, where, in the circumstances of the case, the
testimony served to rehabilitate the credibility of the witness, and where
the judge's conclusion that the probative value of the testimony outweighed
its likelihood to generate prejudice was not unreasonable [744-745].

At a murder trial, although the judge's instruction to the jury on malice errone-
ously referenced all three prongs of malice, no substantial likelihood of a
miscarriage of justice arose, where the judge's instruction was such that a
reasonable juror could only have understood that a guilty verdict by reason
of deliberate premeditation required a finding of purposeful conduct that
included a finding beyond a reasonable doubt of a specific intent to kill
[745-746]; likewise, no substantial likelihood of a miscarriage of justice
arose from the judge's incorrect articulation of the Commonwealth's burden
in his instruction on voluntary manslaughter, where the judge followed the
incorrect statement with an accurate description of the type of provocation
sufficient to reduce murder to manslaughter and the type that is not suf-
ficient, and where, in any event, the defendant was not entitled to a voluntary
manslaughter instruction based on provocation [746-748]; finally, no
substantial likelihood of a miscarriage of justice arose from the judge's
instruction on self-defense, where a slip of the tongue was followed by at
least five correctly articulated instructions on the Commonwealth's burden,
where the entirety of the charge on self-defense showed that the jury's
verdict would have been unsullied by any alleged error in the instructions,
and where the defendant was not entitled to an instruction on the use of non-
deadly force in self-defense [748-751].

There was no merit to the criminal defendant's claim that his counsel was
ineffective for failing to retain an expert to conduct an independent forensic
investigation, where the defendant failed to demonstrate that any error by
counsel was likely to have influenced the jury's conclusion, and where the
defendant failed to show that forensic examinations that police did not
conduct were reasonably necessary or appropriate, such that the failure to
conduct them might create a reasonable doubt about the defendant's guilt
[751-754]; further, there was no merit to the defendant's claim that counsel
was ineffective for failing to examine two witnesses as to potential bias
[754] or for failing to move to exclude or to object to the admission of
photograph identification cards [754-755].

INDICTMENTS found and returned in the Superior Court Depart-
ment on July 24, 1991.

The cases were tried before *Elizabeth J. Dolan*, J., and a mo-
tion for a new trial, filed on March 16, 2004, was heard by
*David A. McLaughlin*, J.

*Judith H. Mizner* for the defendant.

*William R. Connolly*, Assistant District Attorney, for the
Commonwealth.

BOTSFORD, J. A jury in the Superior Court found the defend-
ant, Charles P. Dyer, guilty of murder in the first degree of Roy
Drew on a theory of deliberate premeditation, and also of armed

assault with intent to kill George Eldridge.[1] Before us is the defendant's appeal from his convictions and from the denial of his motion for a new trial. The defendant argues that he is entitled to reversal of the convictions and a new trial on the grounds that the court room was improperly closed during individual voir dire of prospective jurors; the judge, outside the presence of the defendant, improperly questioned jurors and discussed questions from the jury; he was improperly denied a posttrial evidentiary hearing on the possible bias of two deliberating jurors; the trial judge committed evidentiary errors; the judge's instructions on malice, voluntary manslaughter, and self-defense were in error; and his trial counsel was ineffective in many respects. We affirm the defendant's convictions and the denial of his motion for a new trial, and we decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* a. We recite the facts as the jury could have found them at trial, reserving other facts for later discussion. The events giving rise to the indictments took place on June 28, 1991, in the apartment of Carol Drew (Carol)[2] in Fall River. The defendant was the long-time boy friend of Carol's daughter, Janice Drew (Janice). As of June, 1991, Janice and the defendant had lived together for approximately eight years and they had a four year old daughter together, but around June 9, Janice left the defendant in Maine, taking their daughter with her. She and the child came to the Fall River area, and by June 28, they were living in a homeless shelter in neighboring New Bedford. The defendant was desperate to find Janice and their daughter.

Early in the morning of June 28, following a telephone call from the defendant, Carol told her son George Eldridge (George), who was staying with her, that the defendant was coming to the

---

[1]The defendant also was found guilty of unlawful discharge of a firearm and unlawful carrying of a firearm; the unlawful discharge conviction was placed on file, without objection by the defendant. The jury found him not guilty of two counts of assault with intent to murder and one count of assault and battery by means of a dangerous weapon.

[2]Carol Drew is the mother of the victims Roy Drew and George Eldridge, and is also the mother of Janice Drew, who, as stated in the text, had been the defendant's girl friend for the eight years prior to June of 1991. Because of this familial relationship and the fact that most share the same surname, we primarily refer to each of these family members by their first names in this opinion.

apartment. The defendant arrived and said he had some important information for Roy Drew (Roy), another son of Carol. Following a brief conversation, the defendant left, with plans to return thereafter to speak with Roy. Later that morning, the defendant returned at the same time as Roy; the defendant told Carol, George, and Roy that he had compromising videotapes of Janice, and that he had shown them to the police. Roy left to get Janice, leaving the defendant with George for several hours.

That afternoon, Carol, Roy, Janice, and the child rejoined George and the defendant in Carol's apartment. Carol, Roy, Janice, George, and the defendant engaged in a tense discussion around the kitchen table regarding the defendant's desire to have Janice and the child return to live with him; Janice's refusal to do so; the Drew family's demands for financial support from the defendant; and the defendant's claim that his videotapes of Janice were damaging to her. Some time into the conversation, the defendant went to his car and retrieved a brown satchel and one videotape. He played a portion of it for Roy, George, and Janice; it showed Janice engaged in sexual acts. When the Drews denied the videotape was damaging, the defendant returned to his car and came back with a small blue suitcase, containing additional videotapes. He played the second videotape depicting Janice in sexual acts, and Roy, George, and Janice grew more upset.

The conversation resumed in the kitchen. Janice said she wanted $7,000 from the defendant to move with the child and her brothers out of State, and resettle where he could not find them. The defendant claimed to have a videotape of Janice with two men. When Janice, visibly upset, claimed she had been raped by the two men, the defendant acknowledged setting up the rape in order to record it. He then said that he would give George the money Janice wanted, and that he intended to kill himself. Janice watched the defendant walk to the brown satchel, open it, and pull out a gun.

George had been standing near the kitchen table with his head down, and when he looked up, he saw the defendant standing near the apartment door with a gun in his hand. Roy was next to the defendant. Roy stepped forward and told the defendant to give him the gun. The defendant took a step toward Roy, the gun fired, and Roy fell to the floor. George, standing on the other side

of the table next to Janice, pulled her to the floor, and another shot was fired. George then stood up and lifted up one of the kitchen chairs, holding it in front of himself; the defendant shot George in the left hand. After George fell to the floor, the defendant kicked him and shot him in the shoulder. The defendant then went into the bedroom where Carol was holding the child. He pointed the gun at Carol, but it did not fire. Janice ran into the bedroom after the defendant and began hitting him on the back with her hands; the defendant turned, put the gun to her head, and "clicked it," but the gun again did not fire. The defendant hit Janice on the head with the gun, and she fell to the floor.

The defendant left the apartment. Carol yelled for someone to contact the police, and a neighbor did. The police arrived almost immediately. George survived his two gunshot wounds, but Roy died as a result of a gunshot wound to the chest. The police discovered the defendant's car parked near the apartment, and in it found many of the defendant's belongings, including at least four identification cards showing the defendant's photograph and a variety of names, none of them the defendant's.

b. The defendant testified at trial. He explained that he set up the videotape surveillance of Janice because he suspected she was an unfit parent, but that in early June, 1991, when Janice discovered that he had recorded her, she left him in Maine and took the child. The defendant further explained that the focus of all his activities was to find Janice and the child and to seek a resolution of the issues between him and Janice so that he could be with the child. He arrived at Carol's apartment early in the morning of June 28, and sometime later, Roy arrived. He and Roy then left the apartment and went to the defendant's car, where he showed Roy the videotapes he had brought as well as a gun. Roy proposed that they sell the gun, and when that turned out not to be immediately possible, Roy took possession of the gun. Roy and the defendant eventually returned to Carol's apartment, and at some later point, Roy left to get Janice and the child.

According to the defendant, in the conversation after Roy and Janice returned, Janice and her brothers insisted that Janice would be moving out of State with the child, and they demanded

money — at least $8,500 — from him. He denied responsibility for setting up or videotaping a rape of Janice, but once he retrieved and played the two videotapes, "everyone was screaming at [him]." He tried to leave the apartment, but George blocked his exit. Roy was on the defendant's other side, and the defendant turned so that he was backed up against the wall. Roy was saying the defendant would never have visitation rights to see his daughter.

At this point, his daughter ran across the room, screaming for the defendant to help her. George was repeatedly demanding the money that the defendant had indicated he would provide for Janice. When the defendant reached into the brown satchel to get the money, Roy hit the defendant low in the stomach with the gun, which had been in Roy's possession since the morning, causing the defendant to bend over. Roy had both hands on the gun. The defendant, still holding the blue suitcase in one hand, with his other hand "grabbed" the gun and Roy's hand and twisted them. George grabbed the defendant's arm in a grip the defendant could not break, and the defendant struggled with Roy, who was "smashing" him against the wall. When the defendant's arm was pulled, the gun went off, and Roy fell to the floor.

George then hit the defendant with a chair, and the defendant picked up the gun from where it had fallen on Roy's prone body. The defendant shot at the chair twice to scare George. George tried to push the defendant down the stairs, and the defendant pulled the trigger of the gun again, this time hitting George. Thereafter, the defendant briefly picked up his daughter, who was standing by herself in the bedroom. Carol then pushed him, and when he turned around to leave the bedroom, Janice grabbed him. The defendant could not get away, and "might have hit [Janice] on the top of the shoulder maybe twice." At that point, the defendant put the gun on the table, briefly went over to George and saw that George was breathing. The defendant then turned to see about Roy, but Carol yelled repeatedly that she was going to kill the defendant, so he left the apartment.[3]

The defendant's trial was held in the summer of 1994. At its

_____

[3]The defendant also testified (and was cross-examined) at some length about his activities following the shootings, which he said involved first driving in his car, then abandoning it and hitchhiking a ride to Lowell, from

conclusion, as stated, the jury, inter alia, found the defendant guilty of murder in the first degree of Roy, and of armed assault with intent to kill George,[4] but not guilty of assault with intent to murder Carol or Janice. While the defendant's appeal was pending in this court, he filed a motion for a new trial that was heard by a Superior Court judge (motion judge) other than the trial judge.[5] After a nonevidentiary hearing, the motion judge denied the new trial motion in a comprehensive written decision. The defendant timely appealed, and his consolidated appeal from his convictions and from the denial of his motion for a new trial is now before this court.

2. *Jury claims.* The defendant raises several claims related to the selection of the jury, and to communications between the judge and members of the jury. We consider these claims sequentially.

a. *Public trial rights during individual voir dire.* The defendant argues his right to a public trial guaranteed by the Sixth Amendment to the United States Constitution was violated when jurors were questioned individually by the trial judge in her lobby, from which the public was excluded. The record shows prospective jurors were questioned by the trial judge one at a time in the presence of the defendant, counsel for both sides, the court reporter, and the court clerk. The trial took place during the summer and the court room was warm. The judge explained to the defendant the reason for the move as follows: "We have chosen to have it in chambers with as comfortable a proceeding as possible as opposed to the courtroom. I know the air conditioning isn't everything we would like it to be. . . . Considering the building, this is the best we can do."

The defendant argues that conducting individual voir dire in the trial judge's lobby constituted at least a partial closure of the court room, and that the judge made no findings that would justify such a closure. He claims never to have waived his

whence he continued to Maine and then New York and Florida. He surrendered himself to the police in Massachusetts in the middle of August, 1991.

[4]The charge of assault with intent to kill George was presented to the jury as a lesser included offense of assault with intent to murder.

[5]The trial judge had retired by the time the defendant filed his motion for a new trial.

rights to a public trial, and that his counsel was ineffective in failing to object to the partial closure.[6] The Commonwealth counters that defense counsel validly consented on the defendant's behalf to individual voir dire in the judge's lobby, and that the defendant's claim of a Sixth Amendment violation was waived when he failed to preserve the issue through objection after the closure had occurred.

The closing of a proceeding to the public may implicate rights guaranteed by the First and Sixth Amendments to the United States Constitution. *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 106 (2010). The public trial right applies to jury selection proceedings. *Id.*, citing *Presley* v. *Georgia*, 130 S. Ct. 721, 723-724 (2010); *Commonwealth* v. *Horton*, 434 Mass. 823, 831-832 (2001). A violation of the right to a public trial "is a structural error and not susceptible to harmless error analysis." *Commonwealth* v. *Cohen (No. 1)*, *supra* at 105, quoting *Commonwealth* v. *Baran*, 74 Mass. App. Ct. 256, 296 (2009). However, the court considers "whether the defendant raised this issue in a timely manner because 'the right to a public trial, like other structural rights, can be waived.' " *Commonwealth* v. *Cohen (No. 1)*, *supra* at 105-106, quoting *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 173 (2009).[7] Unlike waiver of the right to counsel, see *Commonwealth* v. *Means*, 454 Mass.

---

[6]The defendant suggests that, far from waiving the right, he expressed a concern about "being heard" during individual voir dire. Late in the first day of jury empanelment, defense counsel notified the trial judge that the defendant wished to waive his presence during the voir dire. The defendant explained he had to go to the bathroom, needed to drink water, and was injured by the shackles. The transcript then quotes the defendant saying, "It's really being heard." The judge responded that wearing shackles while in transit to and from the court room was not unusual, that the defendant could have a glass of water, and that they had just taken a break. The defendant repeated that he was thirsty, but the judge said, "All of us are working under the same conditions," and did not agree to permit the defendant to leave. The defendant was again in court when jury selection continued on the second day. In the context of the discussion, it is possible that the comment, "It's really being heard," was mistranscribed, because otherwise it is a nonsequitur; he may, for example, have said, "It's really been hard." At any rate, it is apparent from the transcript that the defendant wished to have less of a role, not more of one, in the juror voir dire proceedings. We do not find any instance in the record where the defendant raised any objection to the voir dire other than his desire to waive his own presence.

[7]In *Commonwealth* v. *Horton*, 434 Mass. 823, 832 (2001), this court reviewed

81, 89-90 (2009), this court has not required that waiver of public trial rights be memorialized in a colloquy.

The defendant had a right to individual voir dire in open court. *Commonwealth* v. *Horton*, 434 Mass. at 831. See *Presley* v. *Georgia*, 130 S. Ct. at 724 (accused has "a right to insist that the voir dire of the jurors be public," absent overriding interest to contrary). The record does not suggest the requirements were met for a partial closure of the court, i.e., a substantial reason for closure; closure no broader than necessary to protect the interest likely to be prejudiced; consideration of reasonable alternatives; and adequate judicial findings. See *Commonwealth* v. *Caldwell*, 459 Mass. 271, 282 (2011), citing *Waller* v. *Georgia*, 467 U.S. 39, 48 (1984). However, the defendant waived his rights by consenting to the proceedings.[8] He was present throughout voir dire,

---

for substantial likelihood of a miscarriage of justice a claim that public trial rights were violated during a murder trial. This standard of review may appear to conflict with a structural error analysis, but, on closer examination, it does not. In *Horton*, as in this case, the defendant argued his counsel was ineffective in failing to object to the judge's conducting individual voir dire of prospective jurors in a place other than open court. *Id.* at 831. Without using the word "waiver," the court in effect applied a waiver analysis in concluding that "[t]he defendant did not object to conducting voir dire in the jury deliberation room, and he never asserted that it violated his right to a public trial" and therefore "failed to preserve the issue for appellate review." *Id.* at 832. In other words, the court concluded that the defendant waived his claim of constitutional error. However, perhaps in light of the fact that it was conducting its review under G. L. c. 278, § 33E, the court in the *Horton* case then applied an additional layer of review, for a substantial likelihood of a miscarriage of justice. *Id.* We apply the same analysis here. To do otherwise would require either that we allow no review of a waived constitutional claim, or that we apply a structural error analysis despite the waiver. The former option would give less protection to waived constitutional rights than to ordinary claims of unpreserved errors in the context of a G. L. c. 278, § 33E, review. The latter would require us to ignore — at great cost to the public interest in the finality of verdicts — the established rule that public trial rights may be waived. See *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 105-106 (2010), and cases cited. Cf. *Commonwealth* v. *Amirault*, 424 Mass. 618, 637 (1997). We therefore restate that the principal issue in regard to the defendant's claim is one of waiver, but we will also apply an extra level of review under G. L. c. 278, § 33E.

[8] Although he brought up other complaints, neither the defendant nor his counsel raised any concern about the judge's decision to conduct individual voir dire in her lobby. See note 6, *supra*. See also *Commonwealth* v. *Williams*, 379 Mass. 874, 875-876 (1979), and cases cited (incumbent on defendant and counsel to object to exclusion of public from trial). Although not directly

and, in light of his complaints of discomfort, on balance was helped more than harmed by the setting. The defendant points to no factors suggesting, notwithstanding the waiver, that a substantial likelihood a miscarriage of justice occurred. See *Commonwealth v. Horton, supra* at 832-833. We therefore decline to order a new trial.

b. *Questioning of jurors during trial.* In his motion for a new trial, and again on appeal, the defendant argues that he was excluded from certain portions of the trial in violation of his rights to confrontation and due process guaranteed by art. 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution.

The background to the defendant's claim follows. At the beginning of the fourth day of trial, the judge spoke to a juror (Juror A) who was a cook at the Massachusetts Correctional Institution at Framingham (MCI-Framingham).[9] Juror A said that when he heard the prosecutor say Janice had been prosecuted, he "wonder[ed]" whether he would know her.[10] The judge instructed Juror A not to discuss the matter with other jurors and not to consider where Janice served her sentence as relevant to the case. The judge then spoke with another juror (Juror B), who explained that she had unanticipated child care problems. Neither defense counsel nor the prosecutor was a party to the judge's separate conversations with Juror A and Juror B, but the judge immediately related the contents of the conversations to both counsel.[11] The judge proposed that Juror B, but not Juror A, be excused; defense counsel agreed and agreed to proceed with fifteen jurors. The judge then excused Juror B.

---

relevant to the question whether there was a waiver at trial, we note that the defendant did not raise the issue in his motion for a new trial, in either of the two supplements he filed to that motion, or at the hearing on the motion.

[9]The juror had raised the subject with the judge via a court officer.

[10]The juror apparently was referring to a statement made by the prosecutor in his opening statement the prior afternoon, on the third day of trial, to the effect that Janice had been prosecuted by the Bristol County district attorney's office and had been sentenced for statutory rape. Juror A clarified he had not talked to anyone about the matter, and agreed with the judge's question or suggestion that if he recognized Janice, it should not affect him as far as the case was concerned.

[11]The court reporter transcribed the judge's conversations with Juror A and Juror B and the judge's relaying of those conversations to both counsel. The record shows that the judge accurately described her conversations.

Subsequently, on the eighth day of trial, the judge again spoke with Juror A, at sidebar.[12] Juror A stated he did recognize Janice from MCI-Framingham, but that he had never had a conversation with her. He agreed that the prior contact with Janice had no effect on his ability to be fair and impartial, and no bearing on the case. Immediately thereafter (and with counsel still present), the judge questioned another juror (Juror C) about whether the juror had given a signal of recognition to a spectator. Juror C said he had not, and had not noticed anyone among the spectators. Defense counsel was present at sidebar for this second interaction with Juror A, and the interaction with Juror C, but the defendant was not at sidebar with them.[13]

When a judge conducts an inquiry about a consequential matter, such as an allegation of serious misconduct of a juror or a suggestion of juror bias, the defendant is entitled, based on confrontation and fair trial rights, to be present. *Commonwealth* v. *Angiulo*, 415 Mass. 502, 530 (1993), and cases cited. See *Commonwealth* v. *Robichaud*, 358 Mass. 300, 301-303 (1970) (reversal required under art. 12 where defendant excluded, over defense counsel's objection, from hearing on juror misconduct). The defendant, however, may waive this right. More particularly, if the defendant makes no request to be present, the judge takes no steps to exclude him, and counsel never objects to his absence, the issue is waived and this court will not address it on appeal. *Commonwealth* v. *Perry*, 432 Mass. 214, 238 (2000), and cases cited. In addition, the judge may conduct administrative formalities outside the defendant's presence. See *Commonwealth* v. *Angiulo*, *supra* at 530-531, citing *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 399 n.3 (1975). Even where the inquiry is about a consequential matter, the defendant's absence does not necessarily constitute reversible error. *Commonwealth* v. *Angiulo*, *supra* at 530 n.25. See *Commonwealth* v. *Martino*, 412 Mass. 267, 286-287 (1992) (absence of defendant from col-

---

[12]This second colloquy with Juror A occurred because Janice conveyed to the judge that she thought she recognized the juror.

[13]Although the defendant was not present at sidebar, the record does not indicate that he was absent from the court room during the sidebar conversations, that he asked to be present at sidebar, that the judge actively excluded him, or that defense counsel objected to his absence.

loquy with juror not reversible error where defendant was fully informed and agreed to discharge of juror).

It would have been better practice for the judge to involve counsel and, if requested, the defendant in the conversation with Juror A on the fourth day of trial, because the juror was disclosing a matter that might suggest bias. However, where the judge and Juror A had substantially the same conversation in the presence of counsel on the eighth day as they had had on the fourth day, error, if any, does not require reversal.[14],[15] See *Commonwealth* v. *Martino*, 412 Mass. at 286-287. Contrast *Commonwealth* v. *Angiulo*, 415 Mass. at 522, 530-531 (exclusion of defendant and counsel from interviews regarding possible juror intimidation compounded other jury errors; reversal required).

With regard to Jurors B and C, there was no error. Juror B's communication of her child care concerns was an administrative matter, see *Commonwealth* v. *Angiulo*, 415 Mass. at 530, and the judge properly involved counsel before taking any action based on her conversation with the juror. The colloquy with Juror C occurred at sidebar with the defendant's counsel present and, as with the second conversation with Juror A, the defendant waived his own presence at sidebar when he did not ask to be present and his counsel did not object. See *Commonwealth* v. *Perry*, 432 Mass. at 238.

c. *Responding to questions from the jury during their deliberation.* The defendant argues he was improperly excluded on two occasions from discussion between the judge and counsel regarding questions from the jury.[16] A defendant has the right through his counsel to be consulted as the judge fashions a response to

---

[14]At this second conversation with Juror A at sidebar, the defendant waived his own right to be present where he did not ask to be present, and defense counsel did not object on his behalf. See *Commonwealth* v. *Perry*, 432 Mass. 214, 238 (2000).

[15]At any rate, any suggestion of bias was highly attenuated. The juror indicated that although he recognized Janice from the "meal line" at the Massachusetts Correctional Institution at Framingham, nothing about her stood out in his mind. That Janice had been in prison was not extraneous evidence: the prosecutor mentioned in his opening statement that Janice was prosecuted and sentenced for statutory rape of the defendant's teenage son and Janice testified to these facts.

[16]The first question from the jury related to the charge of assault and battery

any jury question of "legal significance." *Commonwealth* v. *Floyd P.,* 415 Mass. 826, 833-834 (1993). We conclude that here the defendant's rights were protected. On the first question from the jury, relating to the assault and battery charge, defense counsel was consulted and agreed to the judge's response as submitted to the jury.[17] We see no indication in the record that any discussion of the second jury question occurred from which the defendant could have been excluded.[18] The judge should have consulted with counsel on the second question, but in the circumstances, where the judge repeated her earlier instruction on deliberate premeditation almost verbatim and where there was no error in the substance of the instruction, we conclude there was no substantial likelihood of a miscarriage of justice.

d. *Denial of posttrial hearing on potential juror bias.* The defendant claims the motion judge erred in denying an evidentiary hearing on potential bias or lack of impartiality of two jurors. The first was Juror A, described in Part 2(b), *supra.* The second was a juror (Juror D) who, at the time of trial, was living with a man who worked as a guard at the jail where the defendant was then being held. The defendant proffered evidence in his motion for a new trial that the guard disliked the defendant and was overheard saying he knew the defendant would "get what he deserves" because his (the guard's) girl friend was on the jury. The guard allegedly stated he could telephone his girl friend to find out what was going on, but added that he would not do so. Juror D did not disclose any relationship to a person in law enforcement during empanelment, but she was not asked to do so as the juror questionnaire asked only about family relationships with members of law enforcement, and not other relationships, even if intimate.

We find no error. The trial judge adequately explored potential

of Janice, a charge of which the defendant was found not guilty. The second was a request for "clarification on the term 'deliberate premeditation.' "

[17]Even if counsel failed to consult the defendant adequately, error, if any, was harmless because on this charge the jury acquitted the defendant. See note 16, *supra.*

[18]In open court, presumably in the defendant's presence, and with an opportunity for counsel to object, the trial judge simply repeated her earlier instructions on deliberate premeditation to the jury; the clear implication in the record is that the judge did not discuss the issue with counsel prior to reinstructing the jury.

bias issues with regard to Juror A, as described above. With respect to Juror D, the defendant's proffer did not sustain his burden to show pretrial bias. In individual voir dire during empanelment, Juror D assured the judge that she would have no problem being fair and impartial in the trial, and the judge found she stood indifferent. The defendant offered no evidence that Juror D was aware of the guard's negative opinion ·of the defendant, or that the juror shared his opinion of this defendant or of defendants generally. Contrast *Commonwealth* v. *Somers*, 44 Mass. App. Ct. 920, 921-922 (1998) (error to discount juror's own expressed concerns of bias deriving in part from fiancée's views on gun control). Cf. *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979) (defendant bears initial burden to show extraneous influence). We conclude the defendant's proffer was insufficient to require an evidentiary hearing into any undisclosed bias of Juror D.[19]

3. *Evidentiary errors.* The defendant raises three claims of error pertaining to the admission and exclusion of evidence. Because, except as noted, he did not object at trial, we review the claims to determine whether there exists a substantial likelihood of a miscarriage of justice.[20] *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). As the motion judge was not the trial judge and took no evidence, we review these evidentiary

[19]We also agree with the motion judge that the defendant's submissions in his motion for a new trial did not amount to any implication of misconduct by Juror D. While the guard's alleged statement suggests he knew that his girl friend was serving on the defendant's jury, the timing of the jury service alone would have allowed the guard to reach that conclusion. The record indicates the trial judge was the only judge sitting in the Superior Court in New Bedford for parts of the defendant's trial; we surmise no other long trial coincided with this one. At any rate, to the extent the defendant implies the boy friend directly influenced Juror D's opinion of the defendant, the critical inquiry is whether there is any evidence the boy friend actually communicated to Juror D information or an opinion that may have affected her impartiality. See *Commonwealth* v. *Guisti*, 434 Mass. 245, 251-253 (2001). The defendant does not proffer any such evidence of extraneous influence, but instead argues the mere fact of Juror D's close relationship with a member of law enforcement raises the possibility that Juror D was biased against the defendant. This argument is insufficient.

[20]For those claims that were preserved at trial, we look to see whether error, if any, prejudiced the defendant. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

issues de novo. See *Commonwealth* v. *Lykus*, 451 Mass. 310, 326 (2008).[21]

a. *Evidence of state of mind.* The defendant argues error in the admission of evidence that the Drew family was afraid of the defendant, claiming that the evidence was not relevant to any material issue at trial and served only to prejudice the jury unfairly against him. The claim fails.

Beginning with defense counsel's opening statement, the defendant sought to portray himself as a dedicated father seeking only to protect and care for his daughter. Counsel stated in his opening that before June 28, the defendant was trying repeatedly to have contact with members of the Drew family in order to find Janice and his daughter, but that the family in substance sought to extort money from him in exchange for allowing the defendant to see his child, and that on June 28 in Carol's apartment, the same extortionate message was delivered. The defendant himself later testified that on June 28, Roy announced that Janice was present in Carol's apartment to talk about visitation with the child; that they (the Drew family) had all decided that Janice required at least $5,000 to relocate and another $3,500 to pay for school; and that both George and Roy repeatedly and insistently demanded money from him before Roy hit the defendant with the gun.

Given the defendant's version of the events of June 28 and the preceding weeks, including in particular his claim that on June 28, he acted in self-defense in response to Roy and George's aggressive extortion efforts, evidence that the Drew family

---

[21]In his motion for a new trial, the defendant raised the errors reviewed in this section as erroneous rulings of the trial judge, as well as, in most instances, claims of ineffective assistance of counsel because of counsel's failure to object. We have stated that "if a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Accordingly, in conducting our review in this case under G. L. c. 278, § 33E, we do not focus primarily on whether or not counsel's performance was adequate, but on "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* We agree with the motion judge in this case that, aside from the issue discussed, see note 22, *infra*, there was no error in the evidentiary rulings challenged by the defendant.

members were afraid of the defendant at that time was relevant to rebut the defendant's very different picture of what happened.[22] Cf. *Commonwealth* v. *Magraw*, 426 Mass. 589, 593-594 (1998) ("A murder victim's state of mind becomes a material issue if the defendant opens the door by claiming that the death was a suicide or a result of self-defense, that the victim would voluntarily meet with or go someplace with the defendant, or that the defendant was on friendly terms with the victim"). It is true that evidence of the state of mind of various members of the Drew family, strictly speaking, went beyond evidence of fear of the defendant on the part of the two direct victims, Roy and George. However, because the defendant sought to portray the family as a whole as the aggressor, there was no error.

The defendant further argues that the judge erred in excluding evidence about two conversations he had with Roy that he claims were relevant to his state of mind at the time of the shooting. During trial, he sought to testify as to what Roy said in those conversations, but the prosecutor objected to both, and these objections were sustained.

Defense counsel made no offer of proof at trial (or on appeal) as to the contents of the claimed conversations, and again did not do so in his motion for new trial. On the present record, therefore, we can discern neither the substance of what the testimony would have indicated, nor the state of mind that it was being proffered to show.[23] See, e.g., *Commonwealth* v. *Hubbard*, 371 Mass. 160, 174 (1976) (counsel made no offer of

---

[22]The Commonwealth concedes on appeal, as it did while opposing the defendant's motion for a new trial, that Janice's testimony she telephoned personnel at a shelter for victims of domestic violence and told them she had fled from the defendant and was scared of him should not have been admitted. Because the testimony was cumulative of other properly admitted testimony of Janice about the defendant's violent, abusive behavior toward her — including that he ripped "the phones off the walls" in their Maine apartment while yelling, "So, you think you're going to leave me?" on learning that Janice was leaving with their daughter — the error was not likely to have influenced the jury's conclusion. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 324 (2001).

[23]When defense counsel asked, "As a result of [the second] conversation, did anything occur?" the defendant responded, "Yes, I discontinued to try to raise the money." To the extent one might look for an alternative to the absent offer of proof, this testimony does not supply it — that is, the defendant's response gives no hint that the substance of Roy's statement would have been

proof and then unresponsive offer of proof when questions put to defendant during direct examination were excluded; "failure to make an offer of proof when it is required is fatal"). See also Mass. G. Evid. § 103(a)(2) (2011) (no error may be predicated on ruling excluding evidence unless "the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which the questions were asked"). Moreover, the defendant's testimony about what happened in Carol's apartment immediately before and during the shooting directly focused, in part, on his state of mind; the defendant does not explain what other or additional aspect of his state of mind would have been revealed by evidence of the conversations. We find no error.

b. *Evidence of prior bad acts.* Janice testified that she did not tell anyone about the alleged rapes[24] because "I was afraid that [the defendant] would blame me and I would end up getting another beating from him." The defendant argues that this statement improperly implied a pattern of prior bad acts on his part, and its admission was error.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). For example, "[a] witness who has been impeached by [her] testimony that [s]he was silent in circumstances naturally calling for expression may explain why [s]he was silent." *Commonwealth* v. *Errington*, 390 Mass. 875, 880 (1984). Although, in contrast to the witness in the *Errington* case, Janice was not directly impeached by her failure to report the incident, see *id.* at 879-880, the defendant's theory was that Janice was "very promiscuous" and "threw out

relevant to the defendant's state of mind. Contrast *Commonwealth* v. *Qualls*, 440 Mass. 576, 585 (2003) (victim's statement, hours before being shot, that he stabbed defendant's cousin, followed by defendant's becoming angry and pacing, not hearsay because offered to show defendant's state of mind and possible motive).

[24]As outlined in Part 1 (a), *supra*, before the shooting, Janice said in the presence of Roy, George, and the defendant that she had been raped by two men and that the defendant "had set the whole thing up."

an accusation" of rape when it appeared her brothers might be angry with her and inclined to side with the defendant.[25] In these circumstances, Janice's testimony served to rehabilitate her credibility. And, as previously stated (see note 22, *supra*), there was other evidence, not objected to, that put before the jury the issue of the defendant's abuse of Janice.

"[T]here is ground for excluding [evidence of another offense committed by the defendant] if the prejudice likely to be generated by it outweighs its probative value[,] a matter on which the opinion of the trial judge will be accepted on review except for palpable error." *Commonwealth* v. *Young,* 382 Mass. 448, 462-463 (1981). Here, on objection by counsel, the judge stated, "As the basis for the reason why [Janice] did not tell, I'm going to allow it to stand." The ruling was not unreasonable, and we find no error.[26]

4. *Jury instructions.* There are three claims of error in the jury instructions. The defendant did not object at trial, and therefore we review the challenged instructions to determine whether any created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Torres,* 420 Mass. 479, 483 (1995).

a. *Deliberate premeditation.* The defendant complains that the instruction on malice in the judge's charge on the elements of murder by deliberate premeditation erroneously referenced

---

[25]Janice herself testified that when she said she had been raped and that the defendant had set it up to videotape it, "[t]he tide turned. [George and Roy] finally saw [the defendant] as what I'd been trying to tell them, you know, that he was abusive . . . ." Defense counsel pursued on cross-examination the theory that Janice accused the defendant of setting up and videotaping the rape only to convince George and Roy to take her side.

[26]To the extent the defendant argues a limiting instruction should have been given, because no such instruction was requested, the failure to give one was not error. See *Commonwealth* v. *Errington,* 390 Mass. 875, 882 (1984), and cases cited.

The defendant briefly notes also that the trial judge excluded examination directed at alleged incestuous relationships between Janice and her brothers, proffered as being relevant to Janice's bias. While we may not agree with the judge that Janice's alleged incestuous relationship with Roy, especially, was "totally irrelevant" to the issue of her bias against the defendant, we think that on this record, where there was already substantial evidence of Janice's strong hostility toward the defendant, the prejudicial impact of evidence of incest outweighed any probative value it might have had. See Mass. G. Evid. § 403 (2011).

all three prongs of malice. Because "only the first prong of malice [specific intent to kill] can support a conviction of deliberately premeditated murder," we agree that the judge's malice instruction was incorrect. *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001). However, the judge clearly explained that before the jury could find the separate element of deliberate premeditation to have been proved, they were required to find, beyond a reasonable doubt, that the defendant decided (and thereby intended) to kill the victim.[27] See *Commonwealth* v. *Squailia*, 429 Mass. 101, 107 (1999). There is no substantial likelihood of a miscarriage of justice where, as here, the judge's instruction on deliberate premeditation was such that "a reasonable juror could only have understood that a guilty verdict . . . by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill." *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998), quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). See *Commonwealth* v. *Nolan*, 427 Mass. 541, 544-545 (1998), and cases cited.[28]

b. *Voluntary manslaughter.* After correctly defining voluntary manslaughter, and explaining that voluntary manslaughter is distinguished from murder based on the absence of malice, the judge stated:

"In order to prove a defendant guilty of voluntary manslaughter, the Commonwealth must prove three elements

---

[27]Specifically, the judge explained that in order to prove deliberate premeditation, the Commonwealth "must prove that this defendant thought before he acted, that he formed a plan no matter how simple to murder after deliberation," and that "[t]he sequence would be, first, the deliberation and premeditation, then the decision to kill, and lastly, the killing in furtherance of the decision. The terms 'deliberate premeditation' imply that the act is meditated on beforehand sufficiently long to form both a clear intent and a purpose to carry out that intent."

[28]In reaching this conclusion, we note also that, in response to a question from the jury requesting "clarification" of the term "deliberate premeditation," the judge repeated, again correctly, what the Commonwealth must establish in order to prove the defendant committed deliberately premeditated murder, including a repeat of her instruction that "[t]he term 'deliberate premeditation' implies that the action [i.e., the killing] is meditated on beforehand sufficiently long to form both a clear intent and a purpose to carry out that intent."

beyond a reasonable doubt, that this defendant inflicted an injury upon Roy Drew from which he died, *and that the defendant injured Roy Drew as a result of sudden combat or in the heat of passion* or using excessive force in self-defense" (emphasis added).

As the defendant argues, the emphasized portion of the judge's statement erroneously articulates the Commonwealth's burden. *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998) ("The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did *not* act on reasonable provocation" [emphasis added]). However, the judge followed this incorrect statement of burden with an accurate description of the type of provocation sufficient to reduce murder to manslaughter and the type that is not sufficient (e.g., "mere insulting words or threatening gestures"), and then correctly stated: "However, a killing does not have to be spontaneous with the provocation in order to be done in the heat of passion. *Where there's evidence of provocation the Commonwealth has the burden of proving beyond a reasonable doubt that he did not commit this killing in the heat of passion*" (emphasis added).[29]

We do not read one part of the judge's charge in isolation; "rather, '[t]he test of a charge is the impression which it makes as a whole.' " *Commonwealth* v. *Vives*, 447 Mass. 537, 542 (2006), quoting *Commonwealth* v. *Quigley*, 391 Mass. 461, 467 (1984), cert. denied, 471 U.S. 1115 (1985). See *Commonwealth* v. *Glacken*, 451 Mass. 163, 168-169 (2008). We have here one incorrect instruction, one correct instruction, and a third instruction (see note 29, *supra*) that is simply unclear on the question of burden. Although in the circumstances we cannot say that the

---

[29]The judge thereafter concluded her instruction on voluntary manslaughter with the following:

"If you determine the Commonwealth has not met its burden on the element of malice, then you would determine whether or not the Commonwealth has met its burden on the issue of manslaughter which is an unlawful killing of a human being, absence of malice, malice being mitigated, or negated rather, by the elements of passion, sudden combat, and provocation."

"center of gravity" of the judge's charge to the jury "plainly rested on the side of the correct instruction," *Commonwealth* v. *Lynch*, 439 Mass. 532, 544 (2003), we also "cannot conclude that 'the center of gravity . . . was strongly on the side of misstatement.' " *Commonwealth* v. *Fickling*, 434 Mass. 9, 20 (2001), quoting *Commonwealth* v. *Acevedo*, 427 Mass. at 717.

Moreover, the defendant does not appear to have been entitled to a voluntary manslaughter instruction based on provocation. While voluntary manslaughter differs from murder because of the absence of malice, voluntary manslaughter nonetheless involves an intentional killing. See, e.g., *Commonwealth* v. *Anderson*, 408 Mass. 803, 807 (1990). See also *Commonwealth* v. *Acevedo*, 427 Mass. at 716; Model Jury Instructions on Homicide 32 (1999). The defendant testified that Roy hit him "low" with the gun, causing him to bend over, and that a struggle ensued during which Roy had two hands on the gun, the defendant had one, the gun then went off in a manner that the defendant described as "an accident," and Roy fell; according to the defendant, he did not "even see the gun go off" and did not see Roy get shot. There is thus no indication that Roy's actions "trigger[ed] a sudden loss of self-control in the defendant" that caused him to kill Roy intentionally. *Commonwealth* v. *Benson*, 453 Mass. 90, 95 (2009). Because a theory of reasonable provocation is fundamentally inconsistent with the defendant's theory of defense at trial, we find no substantial likelihood of a miscarriage of justice arising from any error in the judge's instruction. Cf. *Commonwealth* v. *Roberts*, 407 Mass. 731, 737-739 & nn.7, 8 (1990) (where defendant's argument on appeal that judge should have instructed on felony-murder in the second degree premised on lesser included offense of larceny was "inconsistent with the defendant's trial strategy" of seeking acquittal based on self-defense, there was no substantial risk of miscarriage of justice in judge's failure to give instruction).

c. *Self-defense.* The defendant argues the judge erroneously stated the Commonwealth's burden with respect to self-defense when she instructed:

"The Commonwealth must prove . . . that the shooting or killing of Roy Drew was not done in self-defense, and

the Commonwealth must further prove that — strike that. If the Commonwealth fails to prove that it was done in self-defense but proves beyond a reasonable doubt that the defendant acted with excessive force, then it becomes an unlawful killing."

Although the defendant is correct that the judge's second sentence should have been, "If the Commonwealth fails to prove that it was *not* done in self-defense," as the motion judge found, this slip of the tongue followed directly at least five correctly articulated instructions that the Commonwealth had the burden of proving beyond a reasonable doubt that the killing was not excusable by reason of self-defense. Then, immediately following the incorrect articulation, the judge stated, correctly, "If there is evidence, it's up to you, ladies and gentlemen, that the defendant may have acted in self-defense, then the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense." Reading the charge as a whole, as we must, no substantial likelihood of a miscarriage of justice arises from the single misstatement made between two series of correct instructions on self-defense. See, e.g., *Commonwealth v. Oliveira*, 445 Mass. 837, 844-845 (2006) (no substantial likelihood of miscarriage of justice where misstatement in malice instruction was between two correct instructions; when instructions are construed as whole, little chance exists that jury would have misunderstood correct import).

The defendant further contends that the judge's instruction improperly diluted the Commonwealth's burden on self-defense (as well as accident). The judge stated:

"If the Commonwealth fails to meet its burden beyond a reasonable doubt that there was an unlawful killing, to wit, the Commonwealth has failed to prove beyond a reasonable doubt that it was not an accident or that it was not done in self-defense, then the jury would be *warranted* in returning a verdict of not guilty on the charge of the murder indictment on Roy Drew" (emphasis added).

As the Commonwealth concedes, in this context, the use of the word "warranted" is improper because the jury in fact would be

*required* to return a verdict of not guilty if the Commonwealth failed to prove beyond a reasonable doubt that the killing was not an accident or that it was not done in self-defense. Nonetheless, despite this isolated misstatement, the entirety of the charge on self-defense "shows that the jury's verdict of deliberately premeditated murder in the first degree 'would have been substantially unsullied' by any alleged error in the judge's instructions." *Commonwealth* v. *Torres*, 420 Mass. 479, 493 (1995), quoting *Commonwealth* v. *Burke*, 414 Mass. 252, 267 (1993).

Finally, the defendant argues error in the fact that the judge did not instruct the jury on the use of nondeadly force in self-defense. Because the force he testified to using against Roy was that of his hands, and not the gun that fired during that struggle, the argument goes, the defendant was entitled to such an instruction.

At its core, the defendant's argument appears to be that his use of his hands — nondeadly force — in struggling with Roy set the stage for the accidental discharge of the gun, and for this reason, he was entitled to an instruction explaining that he was justified in the use of nondeadly force "in circumstances giving rise to a 'reasonable concern over his personal safety.' " *Commonwealth* v. *Lopes*, 440 Mass. 731, 739 (2004), quoting *Commonwealth* v. *Baseler*, 419 Mass. 500, 502-503 (1995). We disagree. It is true that in determining whether an instruction on deadly or nondeadly force is called for, "[t]he relevant inquiry is what level of force was used, not what the resulting injuries were." *Commonwealth* v. *Pike*, 428 Mass. 393, 396 n.3 (1998). Nevertheless, in considering self-defense as a justification for homicide, the critical point is whether the action or actions taken by the defendant in claimed self-defense actually resulted in the victim's death. See *Commonwealth* v. *Lopes, supra* at 740.[30] Here, there is no dispute that Roy's death was caused by a gunshot, unquestionably deadly force. See *Commonwealth* v.

---

[30]In *Commonwealth* v. *Lopes*, 440 Mass. 731 (2004), the defendant argued that the judge erred in instructing on self-defense only in terms of use of deadly force with no instruction on nondeadly force, because the judge thereby removed from the jury the issue whether he had punched the victim in reasonable fear for his safety. *Id.* at 739-740. The court rejected the argument because the evidence "left no reasonable doubt that the victim died as a result

*Santos*, 454 Mass. 770, 773 (2009) (where gun went off during struggle between defendant and victim, defendant entitled to instruction on self-defense with dangerous weapon [deadly force]). The defendant's argument that his use of force stopped with the use of his hands, and that the subsequent gunshot actually causing the death was only accidental, does not put the use of nondeadly force in self-defense into play as a justification for the killing, but simply raises a defense of accident. The judge properly instructed the jury on accident.[31] The extent of force that the defendant may have used, whether deadly or nondeadly, is irrelevant to a theory of accident. The defendant was not entitled to an instruction on the nondeadly use of force.

5. *Ineffective assistance of counsel.* In addition to the defendant's claims, reviewed above, that were framed in part as claims of ineffective assistance of counsel, see note 21, *supra*, the defendant also argues that in a number of specific respects, his trial counsel's conduct in the preparation for and during trial deprived him of constitutionally effective assistance of counsel, and that these deficiencies require a new trial.[32]

a. *Failure to investigate.* According to the defendant, counsel's

of asphyxiation by ligature strangulation," *id.* at 740, and "no view of the evidence would support a reasonable inference that the victim had died as a result of a punch to the neck." *Id.* Contrast *Commonwealth* v. *Noble*, 429 Mass. 44, 46, 47 (1999) ("Nondeadly force, such as the force of one's fists, hands, and arms, is considered to be nondeadly even if a death results"; where defendant raised self-defense and presented evidence he "did not intend to kill or seriously harm [victim] and that the force he used was unlikely to do so" when he strangled victim by placing his arm around victim's neck, instruction on nondeadly force should have been given).

[31]The judge defined "accident" as "an unexpected happening that occurs without intention or design on the part of the defendant." She then explained, "The Commonwealth must prove beyond a reasonable doubt that the shooting of Roy Drew was not an accident. If the Commonwealth fails to prove beyond a reasonable doubt that it was not an accident, then the defendant must be found not guilty on the indictment charging him with murder."

[32]Despite the defendant's separate argument, however, the same standard of review that applied to the claims previously discussed applies to this claim. That is, "we examine [the defendant's] claim that trial counsel furnished him with constitutionally ineffective representation by determining whether there was an error in the course of the trial by defense counsel, and if there was, whether that error created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Candelario*, 446 Mass. 847, 854 (2006). In doing so, "[w]e give deference to trial counsel's tactical decisions, and ineffectiveness is not

failure to retain an expert to conduct an independent forensic investigation of the crime scene had two prejudicial consequences: it denied the defendant the opportunity to develop and present independent evidence to support his version of events and contradict the Commonwealth's; and it also deprived him of the ability to mount a defense based on inadequacies in the Commonwealth's investigation of the crimes. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980) (*Bowden*).

In support of his motion for a new trial, the defendant filed an affidavit by Peter R. DeForest, a professor of criminalistics, who opined, inter alia, that the crime scene investigators' failure to investigate gunpowder residue patterns and trajectory patterns of bullets, and to conduct additional chemical testing of gunshot and powder discharge, removed a significant opportunity to test witness credibility.[33] However, the defendant has not shown that even if his trial counsel, who apparently was appointed or retained to represent him in or around December of 1992 — almost sixteen months after the defendant was arraigned and almost eighteen months after June 28, 1991, the date of the shootings — had retained an expert in forensic investigation, the kinds of testing of gunpowder residue on Roy's hands, measurement of bullet trajectories, and other analyses described by DeForest could even have been conducted; Roy had been dead for over a year, and there is no evidence as to the condition of the apartment in question. Moreover, even if this kind of investigation could have been made, the defendant has offered, through DeForest, only a theoretical possibility that it would have proved fruitful for the defendant. To succeed on a claim of ineffective assistance of counsel, even under the more favorable standard provided by G. L. c. 278, § 33E, see *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1982), it must be shown that counsel's

found unless those decisions were 'manifestly unreasonable when made.' " *Id.*, quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999). Accord *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003); *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992). See note 21, *supra*.

[33]The defendant contends, for example, that additional forensic testing could have determined whether Roy's hands were on or near the gun when it went off, which had the potential of corroborating the defendant's testimony that Roy was holding on to the gun at the time, and of impeaching the testimony of George and Janice that Roy never had contact with the gun.

error "was likely to have influenced the jury's conclusion." *Id.* The defendant has not made that showing here.[34]

With respect to the defendant's second argument, that counsel's failure to use a forensic expert deprived the defendant of a chance to assert a *Bowden* defense, there is no question that "[d]efendants have the right to base their defense on the failure of police adequately to investigate a murder in order to raise the issue of reasonable doubt as to the defendant's guilt in the minds of the jury." *Commonwealth* v. *Phinney*, 446 Mass. 155, 165-166 (2006), citing *Bowden*, 379 Mass. at 486. It is also true that the DeForest affidavit demonstrates the police did not conduct every test that could have been conducted.[35] However, the defendant has failed to show — through the affidavit or otherwise — that the forensic examinations DeForest describes were reasonably necessary or appropriate for the police to conduct in order to investigate the shootings properly, such that the failure to conduct them might create a reasonable doubt about the defendant's guilt. As the Commonwealth points out, at the time of the police investigation of the crime scene, all the available witnesses with personal knowledge provided the police with congruent statements about the defendant's role as the person who brought the gun to the apartment and shot it at Roy, George, and Janice; the location of the projectiles in the kitchen cabinet and bedroom floor was consistent with the witnesses's statements, as were the medical examiner's observations that the shot that killed Roy was fired at very close range; the defendant himself had fled, abandoning his car that contained .357 ammunition; and the gun was missing. In the circumstances, it is difficult to see why the police or the medical examiner would have been obliged to conduct more or different measurements or tests than they did. The defendant has not shown that trial counsel's alleged failure to mount a *Bowden* defense was mani-

---

[34]Contrast *Commonwealth* v. *Farley*, 432 Mass. 153, 156 (2000) (counsel ineffective due to, among other reasons, failing to investigate sperm cells found at crime scene and failing effectively to cross-examine potential third-party culprit); *Commonwealth* v. *Haggerty*, 400 Mass. 437, 438-440 (1987) (counsel ineffective for failing to call medical expert who could testify that defendant's actions were not proximate cause of victim's death).

[35]For his part, the medical examiner agreed that no specialized tests were conducted to detect gunpowder residue on Roy's hands.

festly unreasonable. See *Commonwealth* v. *Candelario*, 446 Mass. 847, 854 (2006), and cases cited.

b. *Failure to examine Pamela and Janice as to potential bias.* The defendant argues that his trial counsel was ineffective for failing to examine his sister, Pamela, concerning her custody dispute with Janice over his daughter. As a basis for this claim, the defendant asserts that the custody dispute was relevant because it illuminated Janice's potential bias.

The argument fails. We agree with the motion judge, who found that "[t]he transcripts are replete with evidence which established the bias of the members of the Drew family toward the defendant." Janice gave testimony on direct and cross-examination describing discord and ill will between herself and the defendant. It is not clear what, if anything, would have been added concerning Janice's potential bias; at best, this testimony would have been cumulative. Cf. *Commonwealth* v. *Stockhammer*, 409 Mass. 867, 876-877 (1991) (improperly precluded testimony "amounted to a separate and discrete basis of impeachment of the complainant's credibility").

c. *Failure to object to identification cards.* The defendant argues that it was unreasonable for trial counsel not to move to exclude or to object to the admission of photograph identification cards (cards) seized from the car the defendant drove to the scene of the shooting, or to testimony about the defendant's use of these cards and other aliases. Each of the cards featured a photograph of the defendant, but bore a name other than the defendant's name. The defendant argues admission of this evidence improperly suggested criminal propensity.

"Aliases can be suggestive of bad character and prior criminality, and therefore raise a possibility that the jury will improperly consider criminal propensity." *Commonwealth* v. *Martin*, 442 Mass. 1002, 1002 (2004), quoting *Commonwealth* v. *Carter*, 423 Mass. 506, 514 (1996). The same may well be said of cards featuring an accurate photograph of a person but the use of a name different from the person's actual name. However, "a prosecutor may refer to, or ask witnesses about, a defendant's nickname or alias when there is a reason to do so," *Commonwealth* v. *Martinez*, 458 Mass. 684, 697 (2011), and the

same is true of photographic identification. Here, the Commonwealth's questions were relevant to the issue of the defendant's premeditation about the possibility of committing a crime with a gun, and specifically to his intent to flee and conceal his identity after having committed it[36] — actions bearing on consciousness of guilt. See generally *Commonwealth* v. *Toney*, 385 Mass. 575, 582-585 (1982).[37] An objection was not likely to be sustained. In his direct examination of the defendant, counsel had the defendant acknowledge his use of aliases, and then counsel clarified on redirect examination that the defendant had not used these cards for many years before the shootings — i.e., that they were not created or obtained in June of 1991. This was not a manifestly unreasonable approach for counsel to take.

6. *G. L. c. 278, § 33E.* We have examined thoroughly the record in this case pursuant to our duty under G. L. c. 278, § 33E. We discern no basis on which to grant the defendant relief.

*Judgments affirmed.*

*Order denying motion for a
new trial affirmed.*

---

[36]The cards were found in a wallet hidden under carpeting in the car the defendant drove to Carol's apartment, and in a suitcase also found in that car. The defendant stated he had "everything [he] own[ed]" in the car, and he did flee the crime scene after the murder, although he abandoned the car while doing so.

[37]The Commonwealth acknowledges that, while discussing the grounds for admission of the false identifications, the prosecutor offered both a permissible rationale, "intent to flee," and an impermissible rationale, "ability to be an honest individual or not on cross-examination."